**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**JEREMY FUNDERBURG**                                                           **PLAINTIFF**

**V.**                                   **CASE NO. 5:18-CV-009 KGB**

**CITY OF PINE BLUFF, ARKANSAS**                                       **DEFENDANT**

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW THE PLAINTIFF, who for the Brief in Support of Her Response to the Motion for Summary Judgment, states:

<u>INTRODUCTION</u>

Plaintiff brought claims for: (1) illegal exaction; (2) disability discrimination under the ADA, Rehab Act, and ACRA; (3) retaliation under the ADA, Rehab Act, and ACRA; (4) FMLA interference; and (5) FMLA retaliation.

Defendant moved for summary judgment in an 8 page brief.  Around 2-3 pages were devoted to the illegal exaction claim.  Around 3-4 pages were devoted to the disability discrimination claims, ceding the points of actual disability and adverse action, but arguing that Plaintiff could not make out the qualification element.  Around a page and a half were devoted to arguing the FMLA claims, with half of that for the retaliation claims.

In his Response, Plaintiff dismissed the illegal exaction and FMLA interference claims. Plaintiff established that he was able to do several jobs with the City of Pine Bluff, and that Defendant failed to reasonably accommodate him by doing those jobs, and so should go to trial on those claims.  Plaintiff established intent on the FMLA retaliation claims. Plaintiff then pointed

out that Defendant had not argued the issue of intent on the disability or retaliation under the ADA, Rehab Act, or ACRA.  Plaintiff pointed out that since qualification was not an element of a retaliation claim, Defendant had failed to move for summary judgment on the retaliation claims under the ADA/ACRA/Rehab Act at all.

Defendant then filed a Reply raising new arguments and evidence. Plaintiff sought permission to file a Surreply, which was granted, and Plaintiff relies upon that Surreply, hereby incorporated by reference to address those issues.

Defendant then moved to amend its motion for summary judgment, to take a cookie cutter approach to the case, and argue that the FMLA retaliation arguments on intent should apply to the disability discrimination and retaliation claims under the ADA, Rehab Act, and ACRA.  By raising the new arguments so late, it obtained a continuance.  Notably, Defendant's Brief in Support and Statement of Undisputed Facts were not amended, nor has it contested the issue that qualification is not an element of a retaliation case.  So, the only issue that Defendant has now moved on, with respect to the ADA/ACRA/Rehab Act retaliation claims, is the issue of intent.

Defendant is wrong to attempt this cookie-cutter approach.  *First*, the ADA/Rehab Act/ACRA claims involve more and different protected activities.  Plaintiff took 12 weeks of leave under the FMLA, and that was a protected activity under the ADA/Rehab Act/ACRA.  However, as to the ADA/Rehab Act/ACRA claims, Plaintiff also submitted the same letter three different times between March and September, in which he requested that defendant engage in the good-faith, interactive process, and alleged that Defendant was discriminating against him by refusing to do so.  In addition, in March, subsequent to his FMLA leave, Funderburg filed an

EEOC charge, which means that he need note establish a good-faith, reasonable belief in his protected activity.  All these acts were closer in time to the termination than the FMLA leave. *Second,* Plaintiff has direct evidence of retaliatory intent on the claims for disability discrimination and retaliation under the ADA/ACRA/Rehab Act, by virtue of the hostility Whitfield demonstrated toward Funderburg in the March meeting regarding obtaining accommodation for his disability, that immediately preceded his 3 letters and EEOC charge.  *Third,* if the case were analyzed under a *McDonnell Douglas* analysis, defendant has failed to articulate a legitimate, non-discriminatory reason for its conduct as to the ADA/Rehab Act/ACRA claims by virtue of the letter it has offered from Whitfield.

<u>STANDARD OF REVIEW</u>

As this is the summary judgment stage, all facts must be construed in the light most favorable to the Plaintiff, with all favorable inferences drawn.  The Defendant's evidence may be considered to the extent that it "is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000).  Thus, courts have denied summary judgment even where a statement was uncontradicted, because it came from a witness whose interests were aligned with the moving party.  See <u>Bazan v. Hidalgo County</u>, 246 F.3d 481 (5th Cir. 2001);  <u>Abraham v. Raso</u>, 183 F.3d 279, 287 (3rd Cir. 1999) ("Cases that turn crucially on the credibility of witnesses' testimony in particular should *not* be resolved on summary judgment."; <u>Gooden v. Howard County, Md.</u>, 954 F.2d 960, 971 (4th Cir. 1992) (Phillips, J., dissenting) ("[B]ecause inevitably – – liability being disputed – – the officer's account will be favorable to himself, the credibility of that account is crucial."). Obviously the last clause in <u>Reeves</u> comes because establishing bias is a means of im-

peachment.  This is particularly important in employment cases where much of the evidence will come from witnesses who are employed by Defendant who pay them substantial amounts of money, who have control of their livelihood and ability to support their family, and can fire, promote, demote, transfer, layoff, discipline, or harass them.  It should also be noted that employment law allows for contradiction of evidence by indirect means.  For instance in cases involving pretext, an employee need not prove every reason given for an adverse action false, if he provides proof that some of those reasons are false.  See  Dey v. Colt Construction & Development Co., 28 F.3d 1446 (7th Cir. 1994); and Burns v. AAF-McQuay, Inc., 96 F.3d 154, 179 (4th Cir. 1996). In discrimination cases, summary judgment should be granted when only one conclusion is clear because such cases often depend on inferences rather than on direct evidence.  Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994); Johnson v. Minn. Hist. Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991).  Plaintiff need only provide proof to survive summary judgment on any given issue if the Defendant has properly supported its motion with proof on that particular point.  Furthermore, "Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied *even if no opposing evidentiary matter is presented."* Wright & Miller, Civil 3d, Vol. 10b, Sec. 2739 (citing Adickes v. S.H. Kress & Co., 90 S.Ct. 1598 (1970) and Fed. R. Civ. Proc. 56, Advisory Committee Notes, 1963).

<u>FACTS</u>

The facts are recounted in the Response to so Plaintiff is only going to put a few, particularly significant facts in this portion.

When Plaintiff went on leave, it was known that he would return with significant restrictions, and he was told, by Chief Hubanks, that they would not be a problem, and that he had

the IA job.  IA jobs, admin jobs, the TRU job, and the admin job do not require going out on the street, patrolling, fighting, and catching criminals. RSUF, para. 13, 28-37. The IA position was never filled. RSUF, par. 39. Multiple people had physical problems that prevented them from working the street for 10 months or more, and yet were not fired. St. Add'l Facts, para. 1-8.

Plaintiff tried to work with them, and got no cooperation.  When Funderburg took his first note to the Chief and Whitfield said it was not enough, Funderburg asked that they all call the physician right then, and the Chief refused.  Funderburg then asked to go to the city's physician, and the Chief refused, saying it was on Funderburg, not them.  RSUF, para. 9.

Defendant has claimed that there was no job for Funderburg, yet their own position statement says that they offered him a job in TRU, but he refused because it would negatively impact his retirement. Ex. F.  That is false, Funderburg said he would take the job.  Ex. A, Rsp. Para. 21.  On every occasion that Funderburg met with Chief Whitfield about his health issues and returning to work, Whitfield acted and spoke in a threatening way, and made false accusations, threats of discipline, threats against Plaintiff's job. The Chief was shaking his finger in Funderburg's face at the March 23 meeting. At points the Chief was so angry he was spitting in Funderburg's face as he spoke.  RSUF, para. 9, 19, 21, 23.  In that meeting, at its conclusion, Assistant Chief Sergeant said that Funderburg would need a "total clearance" letter. RSUF, para. 21.  Shortly before that meeting, and after having already working the TRU unit for a month, the Chief had told Funderburg that he could work the TRU unit and promised to get that rolling. Plaintiff agreed to do it. He did not refuse it. RSUF, para. 21. A rough transcript of the most significant part of the March 23 meeting is below. If the transcript reads different than the recording, it was an unintentional error:

42:11

CW- What's up man.

JF – What's happening? You doing ok?

. . . . ;largely inaudible

JF – I'm here for work. My time runs out at 2 o'clock

CW – Now, now, now, I feel like  you're playing with me.

JF – I ain't playing, I'm just. Somebody gotta make a decision here . . .

CW – I feel like you're playing with me.

JF – Somebody's gonna have to make a decision. Just get it over with.

42:50

CW – Ok, you're making it easy. I feel like you playing with me.

JF – I'm not playing with you.

CW You here for work?

JF – I'm here for work.

CW – You're outta uniform.

JF – I come in the uniform that I was last in. ---

4207

CW – I don't know what you got going on. Hold on a minute. I don't know what you got going on. You come here at . . . whatever time you just got here.  You tell me you reporting to work.

JF – Yes sir

CW - Outta uniform.

JF -  my advice

CW – I don't know who advised you what. I done told you before, stop coming the wrong way. You told me. Lemme get it right. That you _____ to the police department, ready for work.

JF – Yes, sir.

4331

CW – And outta uniform. Ok.

JF – This is my last uniform. This is my attire I wore in vice, in narcotics.  And I haven't been assigned to no other unit since vice and narcotics.  This is what we wear in vice and narcotics. Unless the policy has been changed while I've been off.

4348.

CW – Where is your release from your doctor.

JF – I give you the release that I had, when you sent me home. That's the release I've got from my doctor.

4355

CW – So, you, you, you, reporting to work.

JF – Yes sir.

CW – Without official release from a doctor.

JF – No sir. I've given you my release.

CW – You gave me a release, and you've been on sick leave for how long?

44:08

JF – No sir, I've been using my vacation.

CW – What'd you use before you used vacation?

JF – Sick leave.  Which you chose to pay me sick leave Chief. You said I'm gonna give you sick leave. I'm gonna pay you.

4420

CW – I gave you sick leave. Not to use. If you need it I gave it to you. Not to use. You use sick leave when you need it.

JF – Ok.

CW – Ok

CW – So

JF – So

CW – if you gonna take sick leave – see let's go back to policy. After 3 days of sick leave what are you gonna bring me?

JF – A doctor's note.

4437

CW – Ok, do you, you have that? Cause I don't know – maybe I'm forgetting it, when you were in vice, you were in vice, but do you have that?

JF – No sir. I give you the note to return to work the last time I was here.
4448

CW – Ok but since then

JF – And you said go home

CW – Ok

JF – Think about it. I'm gonna pay you for your sick time.

CW – Ok.

4459

JF – And use up all your vacation. Well you know what, my sick time

4502

CW – I told you to use up your sick leave and vacation?

JF – Yes sir. Yes sir. You sure did.

4508

JF And I told you.

CW – One thing I can say about you and your wife. I do believe you all are good at recording what I say. Bring me that tape where I said go home and use up all your sick leave. You said to me that you were going on vacation. I said to you how does that look for you to be on vacation on sick leave. You're going on a cruise. I said to you how does that look you being on a cruise on a sick leave.

4536.

JF – No. No sir.

CW – You said to me I got to do it that way because I want to work my truck. Can I work my truck. I said to you, what does policy say
.
4546

JF – And I abided by policy. It says

CW – You abided by policy?

JF – I stayed at home. I stayed at home. When my sick time was up, I started using my vacation. Today I'm out of both. I've either got to come to work, or you've got to relieve me of my duties. One of the two.

CW – Well you gonna relieve yourself of your duties.

4603

JF – No sir. No sir.

CW – You gonna relieve yourself of your duties.

JF – No sir.

4608

CW – You gonna do it. You doing a good job of it. You are doing a mighty good damn job of it. You doing a good job of it. You doing a splendid job of it. Relieving yourself of duty. I don't know what lawyer done told you to come to the police department this way. But that ain't the way to do it. I told you that, and I told you to go talk to Deputy Chief Elliott. I told you that. We don't have a job.  Whatever you trying to say that you can't get hurt

4637

JF – And

CW - ____. Nobody has a job. Matter of fact, I'm going to call them this week and I'm gonna tell em. Nobody has a job that a person can be put in away from danger. I got a secretary that's in danger. Anybody come to the police department, the fire department, it's dangerous. So therefore, it literally don't make sense. And then, not only, on top of that, you come back with a bad attitude I don't understand

4704

JF – I don't have a bad attitude chief.

CW – Oh you really do. You, you really do. You should have learned while you was out to come back, kind of be humble. But do what you got to do. I'll do what I got to do. Uh, if you've been on vacation fine. If you use 3 days sick follow policy. Long as you follow policy, I'm fine. They'll bring it to me, and I'll tell em what I'm going to do.

4729

JF – So you want me to go to my doctor right now and get a note . . .

CW – Hold on lemme tell you something – I don't want you to go nowhere.

4735

JF – Ok

CW – You do what you want to do to follow policy. Since you come up with this attitude. You follow policy.

JF – Chief

CW – See hold on a minute – see it's bad. It's kinda like playing football. And I tell you because the clock running out, I'm gonna throw the ball. You programmed this day. You told us or me. I'm gonna come back and make you fire me. I said to you, I'm gonna make you fire yourself.  It ain't my job to fire you. You gonna do it. And you know what , you doing a good job of it.

D.E. 27.

On March 28, 2017, Funderburg did a letter to the Chief and to Vicki Conaway, making a

combined request for accommodation and complaint of discrimination and retaliation. He de-

scribed the March 23, 2017 meeting in detail.  He would send that letter to them two more times

between March 23, 2017, and his termination. He requested that they engage in the good faith

interactive process, and give him a job in IA, the evidence room, TRU, or anywhere in the City.

Neither the Chief, nor Conaway, nor anyone from the department met with him or communicat-

ed with him to address the complaint at all.  RSUF, para. 23, 38.  Kelvin Sergeant met with him

shortly before the termination.

On April 5, 2017, Funderburg was forced on to FMLA leave because they would not let

him work.  RSUF, para. 24-26.

Shortly before Funderburg's termination on September 5, 2017, Funderburg had been

told to show up to work, so he went in.  He met with Assistant Chief Sergeant, and Deputy Chief

Elliot. Sergeant told him there were a couple of jobs coming available. One was a civilian job

open in vice and narcotics.  Funderburg was told that he could apply, but that he would have to

resign from the department before he could do so.  Funderburg asked if he was guaranteed the

job.  Sergeant said not, but that Funderburg had as good a chance as anyone. This was odd,

given that Funderburg had excellent performance evaluations as a detective in that division. Funderburg said, will all due respect, I'm not resigning without knowing I have a job or not. He was unwilling to resign because of how they had treated him. Whitfield was clearly angry. They had refused to meet or discuss accommodations for months. Sergeant then made a threat on Funderburg's job, saying that if he got fired from the city, he would never be hired again. This was even though the only reason for the termination would be health issues. The next day, Funderburg spoke with Sergeant and said that he would go ahead and resign and apply for the job. Sergeant then said that Funderburg might not have to resign, that he would look into it and get back with Funderburg. No one got back with Funderburg, and within a few days he got his termination letter. RSUF, para. 40-41, St. Add'l Fact, para. 9. There was no policy requiring Funderburg to quit to apply for another position. St. Add'l Fact, para. 8.

Then, rather than permitting Plaintiff to apply for a position, or simply letting him have the position, as had been implied, Defendant fired Plaintiff, the letter stating:

> We received the letter from your doctor in reference to your surgery and your inability to return to work as a police officer. You have exhausted all available leave time.
>
> In light of the fact that you are unable to perform duties as a police officer, your employment with the Pine Bluff Police Department is terminated effective this date. You have the option to apply for any civilian positions that may be open within the City.

D.E. 9-15.

## ARGUMENT

**I.  Disability Discrimination Claims – Reasonable Accommodations Were Possible**

Defendants have moved for summary judgment on the disability discrimination claims on the grounds that there were not reasonable accommodation available under which Plaintiff

could work for the city.  Defendant's arguments fail because they admit there were jobs available that he could do.

The ADA prohibits discrimination against a "qualified individual with a disability," 42 U.S.C. § 12112(a), and expressly defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).  In order for a plaintiff to recover under the ADA for an employer's failure to reasonably accommodate he must show (1) that he 'was or is disabled' as defined by the Act, (2) that [his employer] was aware of this disability, and (3) that he was 'qualified' for the position in question, and (4) that a reasonable accommodation was denied. L. Sutter, The ADA, A Road Now Too Narrow, 22 UALR Law Review 161*; Best v. Heil Oil Co.*, 107 F.3d 544, 547-48 (7th Cir. 1997).

Plaintiff could have been reasonably accommodated because there were a number of jobs available that he could do.   Once the plaintiff requests accommodation, the parties must engage in an "interactive process" to determine what precise accommodations are necessary. See 29 C.F.R. § 1630.2(o)(3) & § 1630 App., § 1630.9; accord *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999). Failure of an employer to engage in an interactive process is prima facie evidence that the employer may be acting in bad faith. Id., at 952. Once the plaintiff makes a facial showing that reasonable accommodation is possible, the burden of production shifts to the employer to show that it is unable to accommodate the employee. Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995*); Wood v. Omaha Sch. Dist.*, 985 F.2d 437, 439 (8th Cir. 1993); *Arneson v. Heckler*, 879 F.2d 393, 396 (8th Cir. 1989).

In order to be a qualified individual, Plaintiff had to establish that he was able to do his essential job functions, with or without reasonable accommodation. Essential job functions are defined by the regulations as follows:

> "Essential functions—(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position. (2) A job function may be considered essential for any of several reasons, including but not limited to the following:(i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function. (3) Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."

42 C.F.R. 1630.2(n). No one factor is controlling on what is an essential job function. 8th Cir. Mod. Jury Instr. 5.52B. The regulations define a reasonable accommodation as:

> "(o) Reasonable accommodation.
>> (1) The term **reasonable accommodation means**:
>> . . .
>>> (ii) **Modifications or adjustments to the work environment**, or to **the manner or circumstances under which the position held or desired is customarily performed**, that enable a qualified individual with a disability to perform the essential functions of that position; or
>> . . .
>> (2) Reasonable accommodation may include but is not limited to:
>> . . .
>>> (ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

42 C.F.R. 1630.2(o) (emphasis added).

The failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting

in bad faith. *Fjellestad*, 188 F.3d at 951-2.  In concluding that an employer may be liable under certain circumstances for failing to engage in the interactive process to determine reasonable accommodation, the *Fjellestad* court cited with approval a Third Circuit case, *Taylor v. Phoenixville School District*, 174 F.3d 142 (3rd Cir. 1999), and employed the Taylor court's four-part analysis. See Id. at 952. In Taylor, the Third Circuit held that an employer's obligation to participate in the interactive process is triggered once the employer knows of an employee's disability and the employee or the employee's representative has requested accommodation. *Taylor*, 174 F.3d at 158-59. To hold an employer liable, an ADA plaintiff must demonstrate the following factors to show that the employer failed to participate in the interactive process:

> "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith."

*Fjellestad*, 188 F.3d at 952 (quoting *Taylor,* 174 F.3d at 165 (citations omitted).

Courts confronted with the issue of a requiring that an employee be 100%, have no restrictions or be capable of full duty, have found it to be a per se violation of the Americans with Disabilities Act as it precludes an individualized assessment of the employee's ability to do the job with reasonable accommodations.  *Hill v. Walker*, 2013 U.S. Dist. LEXIS 7801, *24-26 (E.D.Ark. 2013).   In *McGregor v. National Railroad Passenger Corp.,* aka Amtrack, the Ninth Circuit reasoned as follows:

> McGregor alleges that Amtrak officials repeatedly told her that she could not return to work or bid on any other position until she was "100% healed," and that such a policy is a per se violation of the ADA. McGregor is correct in noting that "100% healed" policies are per se violations of the ADA. A "100% healed" or "fully healed" policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is "100% healed " from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation. See Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 699 (7th Cir. 1998); Weigel v. Target Stores, 122 F.3d 461, 466 (7th Cir. 1997) (stating that the determination whether one qualifies as a qualified individual with a disability "necessarily involves an individualized assessment of the individual and the relevant position"); Norris v. Al-

lied-Sysco Food Servs., Inc., 948 F.Supp. 1418, 1437 (N.D. Cal. 1996); see, e.g., Heise v. Genuine Parts Co., 900 F. Supp. 1137, 1154 & n.10 (D. Minn. 1995) (holding that a "must be cured " or "100% healed" policy is a per se violation of the ADA because the policy does not allow a case-by-case assessment of an individual's ability to perform essential functions of the individual's job, with or without accommodation); Hutchinson v. United Parcel Serv., Inc., 883 F.Supp. 379, 397 (N.D. Iowa 1995) (same); Sarsycki v. United Parcel Service , 862 F.Supp. 336, 341 (W.D. Okla. 1994) (holding that under the ADA "individualized assessment is absolutely necessary if persons with disabilities are to be protected from unfair and inaccurate stereotypes and prejudices"). As we have noted, whether Amtrak has a "100% healed" policy or its functional equivalent is a disputed issue of material fact which makes granting summary judgment on this issue inappropriate.

187 F.3d 1113, 1116 (9th Cir. 1999).  The reasoning of *McGregor* has been confirmed by other

Circuits.  *See Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011); Duty v. Norton-

Alcoa Proppants, 293 F.3d 491, 497 (8th Cir. 2002) (listing as a basis to support a verdict of in-

tentional discrimination and punitive damages "the absence of any effort by NAP to return Duty

to work unless he functioned at 100% capacity"); *Henderson v. Ardco., Inc*., 247 F.3d 645, 653

(6th Cir. 2001).  The Courts dealing with this issue have generally found that the violation must

cause some sort of injury. Accordingly, if there was no way an employee could be reasonably

accommodated, then they would not be able to make out a case, because they would not have

been accommodated regardless of the 100% policy.

Finally, the very prospect of reassignment does not even arise unless "accommodation

within the individual's current position would pose an undue hardship." 29 C.F.R. 1630.2(o). In

this sense, reassignment is an accommodation of last resort. See Aka,156 F.3d at 1301 ("Con-

gress saw reassignment, as the EEOC does, as an option to be considered only after other ef-

forts at accommodation have failed.*").  *Cravens v. Blue Cross and Blue Shield of Kansas City*,

214 F.3d 10111, 1019 (8th Cir. 2000).  "the employee must be otherwise "qualified" for the reas-

signment position. *See Benson*, 62 F.3d at 1114; 42 U.S.C. § 12111(9)(B). To be considered

"qualified" for this job, the individual must "satisfy the legitimate prerequisites for that alternative

position, and ... be able to perform the essential functions of that position with or without rea-

sonable accommodations ... [though] in this context the term [reasonable accommodation] logi-

cally cannot include transfer to yet a third job." *Dalton*, 141 F.3d at 678. *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 10111, 1019 (8th Cir. 2000).

The Americans with Disabilities Act explicitly lists "reassignment to a vacant position" among the "reasonable accommodation[s]" employers must provide. 42 U.S.S. 12111(9)(B). The EEOC was given statutory authority to promulgate regulations to implement those provisions. 42 U.S.C. 12116. It has done so, stating that "reasonable accommodation" includes "reassignment to a vacant position"). 29 CFR 1630.2(o)(2)(ii).

First, Plaintiff had been told that the IA job was his when he got back, even though it was known that he would have significant physical restrictions.  That he did not need to worry about it he would have a job.  This was because the IA job did not require street type work.  Defendant has CLEST regulations and specifications, but there is nothing in those regulations that indicate Plaintiff's problems prevent him from doing any type of police work.  Defendants were well aware of this because a number of persons could not work the street due to health problems but were allowed to continue.  The IA job was never filled.

Second, if a transfer was necessary, there were the TRU positions and the narcotics secretary positions. Both were offered to Plaintiff, the former by Whitfield a few days before March 23, 2017 meeting, and the latter by Sergeant a few days before his September 5, 2017 termination.  Plaintiff accepted both.  Then the Defendants did not let him have the jobs.  However, what should kept in mind are Whitfield's false accusations, threats of discipline, and angry speech, conduct, and  demeanor around and before March 23, and refusal to meet with plaintiff or address his complaints for six months.  Assistant Chief Sergeant told Plaintiff he had to resign before applying for the secretary job, which was not policy, and then when Plaintiff agreed to do that, said he would get back to Plaintiff, because he might not have to. No one got back to him, and then he was fired.  Both of these jobs were not police officer jobs, that would have represented a significant reduction in pay.  Most likely, they thought Funderburg would not accept them, and they could then fire him.  They did not really want him around, and that is why offers

were made and then withdrawn.  That is not part of the good-faith interactive process.  False statements were made to Funderburg, and that is not part of that process.

Finally, an employee will only be required to meet those qualifications the employer actually requires.  EEOC v. Wal Mart, 477 F.3d 561, 569 (8th Cir. 2007).  The evidence is that the physical requirements defendants now rely upon, were not actually required in the evidence position, the IA position, the TRU position, or the secretary position.  While Defendant argues that state law precludes Funderburg from being a police officer, that is disputed. Furthermore, state law does not trump federal law, which reins supreme. The Eighth Circuit has indicated in the case of illegal immigrants that they could sue, though legally they could not work.  *Lucas v. Jerusalem Café, LLC*, 721 F.3d 927, 933 (8th Cir. 2017) (in FLSA case, stating "employers who unlawfully hire unauthorized aliens must otherwise comply with federal employment laws").  Plaintiff is a citizen, and should be granted the same leeway as a non-citizen.

## II.   Retaliation Claims -Qualification Not Required

Retaliation claims have three elements in the prima facie case: (1) protected activity; (2) adverse action; and (3) causation.  *Evans v. Pugh*, 902 F.2d 689, 693-94 (8th Cir. 1990) (ADEA); *Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003) (ADA); *Sims v. Sauer-Sundstrand Co.*, 130 F.3d 341, 343 (8th Cir. 1997). Being qualified is not an element of the case.  A qualification element has been expressly rejected where it was argued to be part of a retaliation claim.  *Stebbins v. Legal Aid*, 2012 U.S.Dist. LEXIS 158796 (W.D. Ark. 2012) ("Unlike a plaintiff in an ADA discrimination case, a plaintiff in an ADA retaliation case need not establish that he is a 'qualified individual with a disability.'" quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997)). *Krouse* in turn relied upon *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)).  Although Defendant amended its Motion for Summary Judgment, it raised no new arguments on this issue.

Medical leave, including under the FMLA, is a reasonable accommodation. *Browning v. Liverty Mut. Ins. Co*., 178 F.3d 1043, 1049 (8th Cir. 1999) 29 CFR 1630.2(o)(2); 29 C.F.R. 825.702*; Ruark v. Ark. Dem.-Gaz., Inc*., 4:13-cv-283, D.E. 24 (E.D.Ark. 2014); United States Equal Employment Opportunity Commission, The Family Medical Leave Act, the Americans with Disabilities Act, and Title VII Civil Rights Act of 1964, Fact Sheet, http://www.eeoc.gov/policy/docs/fmlaada.html.

There is no dispute that Plaintiff complained of discrimination and requested accommodation. Defendant argues qualification, but that is not part of the prima facie case on a retaliation claim, and if it were, he established he could work for the city if given reasonable accommodations. Defendant did not argue intent at all. Accordingly, the retaliation claims should go to a jury.

### III. FMLA Retaliation Claims

Under the FMLA, "an eligible employee shall be entitled to a total of twelve workweeks of leave during any twelve-month period . . . because of a serious health condition that makes the employee unable to perform the functions of the position of such employee" 29 U.S.C. § 2612(a)(1)(D). FMLA retaliation cases involve the following elements in a prima facie case: (1) eligible employee, (2) covered employer, (3) serious health condition, and (4) appropriate notice of that serious health condition to the employer; (5) an adverse action; and (6) motivated by the use of FMLA rights. Eighth Cir. Mod. Jury Instr. 5.81A.

Courts have found that it is forbidden to retaliate against an employee for taking FMLA leave, even where the person exceeded their FMLA leave. *Rogers v AC Humko Corp*., 56 F.Supp. 2d 972, 978 (W.D.Tenn. 1999); *Jackson v. City of Hot Springs*, 751 F.3d 855 (8th Cir.

2014).   There is no dispute that Plaintiff took FMLA leave.   There is no dispute he was fired. Throughout the process of him attempting to return to work, Chief Whitfield, made threats against him for discipline or against his job, was angry with him, spat in his face, shook his finger at him, offered him jobs and then reneged, refused to address complaints of discrimination and requests for accommodation.   Plaintiff was told that he had to resign in order to apply for a job, which was patently untrue, and which they probably thought was unlikely given that it would be a reduction in pay for Funderburg, and the most rational interpretation of such a statement was that it was a trap.   When he refused, Sergeant told him if he was fired from the city, he would never be hired again (even though the only basis for firing him would be his health issues, which amounts to an admission of illegal intent).   Funderburg then agreed to quit and reapply, but was told he might not have to, and to wait, Sergeant would get back with him. They did get back with Funderburg, but only to fire him.

## IV. Intent on the ADA/ACRA/Rehab Act claims
### A.  Law

There are two means by which Plaintiff can prove discriminatory or retaliatory intent for any of his claims:

> an employee can survive the employer's motion for summary judgment in one of two ways. First, the employee can produce direct evidence of discrimination, that is, "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." 387 F.3d at 736 (quotation omitted). Alternatively, if the employee lacks direct evidence of intentional discrimination, she may survive the employer's motion for summary judgment by "creating the requisite inference of unlawful discrimination" through the familiar three-step burden-shifting analysis originating in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Russell v. City of Kansas City, 414 F.3d 863, 866-67 (8th Cir. 2005). Plaintiff can establish a case for retaliation by means of direct evidence, or through the McDonnell Douglas proof pattern.

## 1. Direct Evidence

Although direct evidence is typically thought of as comments or statements indicating discriminatory intent, this is not complete. Direct evidence can be defined as follows:

> The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial.

Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). An example would be when the Eighth Circuit stated:

> [w]hen two co-workers who are the alleged victims of misconduct deny that misconduct occurred and assert that the plaintiff is herself the victim of discrimination by the employer, that may well be direct evidence of discrimination sufficient to withstand the employer's motion for summary judgment. And if this testimony is not by itself sufficient, it is a powerful showing of the pretext needed to defeat summary judgment under McDonnell Douglas.

Russell, 414 F.3d at 867. In Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cirl 1991), comments by a person involved in the decision-making process that older employees had problems with adaptation and flexibility constituted direct evidence.

## 2. *McDonnell Douglas*

Where a Plaintiff proves discriminatory intent through circumstantial or indirect evidence pursuant to McDonnell Douglas, it should be noted that there are actually two stages where proof of discriminatory intent must be provided. First, in Plaintiff's prima facie case, requiring a

low level of proof.  Second, through evidence of pretext after Defendant has produced a legitimate, non-discriminatory reason.

In <u>Young v. Warner-Jenkinson Co.</u>, 152 F.3d 1018, 1022-23 (8th Cir. 1998), the Eighth Circuit noted that "the threshold of proof necessary to establish a prima facie case is minimal" and that ""[t]he prima facie burden is not so onerous as, nor should it be conflated with, the ultimate issue" of discriminatory action."  <u>Id.</u>, at 1022 n.5 (citing <u>Rose-Maston v. NME Hosp., Inc.</u>, 133 F.3d 1104, 1109-10 (8th Cir. 1998); <u>Davenport v. Riverview Gardens Sch. Dist.</u>, 30 F.3d 940, 944 (8th Cir. 1994); <u>Landon v. Northwest Airlines, Inc.</u>, 72 F.3d 620, 624 (8th Cir. 1995); and <u>Williams v. Ford Motor Co.</u>, 14 F.3d 1305, 1308 (8th Cir. 1994).  In <u>Young</u>, the Eighth Circuit also noted that "the prima facie case will necessarily vary in different factual situations" and that the proof needed is "not inflexible" and "varies somewhat with the specific facts of each case."  <u>Young</u>, 152 F.3d at 1022 (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 n.13, 93 S.Ct. 1817 (1973); <u>Hindman v. Transkrit Corp.</u>, 145 F.3d 986, 990-91 (8th Cir. 1998); and <u>Miners v. Cargill Comm., Inc.</u>, 113 F.3d 820, 824 n.7 (8th Cir. 1997), <u>cert. den'd</u>, 522 U.S. 981, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997).

Accordingly, although producing a comparator is the most common way of doing so, it is not necessary.  In <u>Putman v. Unity Health System</u>, 348 F.3d 732 (8th Cir. 2003), Chief Judge Loken noted that:

> the plaintiff in a discharge case may satisfy his prima facie case burden by showing (i) that he belongs to a protected class; (ii) that he was qualified for a job; (iii) that he was discharged; and (iv) that, after his discharge, he was replaced by a person with similar qualifications.

Loken then stated that:

> In some cases, we have concluded that **evidence of pretext**--normally considered only at step three of the <u>McDonnell Douglas</u> analysis--**satisfied this aspect of the plaintiff's prima facie case burden**. <u>See</u> <u>Young v. Warner-Jenkinson Co.</u>, 152 F.3d 1018, 1022 (8th Cir. 1998); <u>Landon v. Northwest Airlines, Inc.</u>, 72 F.3d 620, 624 (8th Cir. 1995).  A common way of proving pretext is to show that similarly situated employees were more favorably treated. <u>See Harvey v. Anheuser-Busch, Inc..</u>, 38 F.3d 968, 972-73 (8th Cir. 1994)."

Putman, 348 F.3d at 736 (emphasis added). With respect to a retaliation claim, Plaintiff need only establish: (1) a protected activity; (2) an adverse job action; and (3) causation.

### B. Plaintiff has direct evidence of discriminatory intent based on disability

Plaintiff has four forms of evidence constituting direct evidence of discriminatory intent: (1) refusal to engage in the good-faith, interactive process; (2) application of a 100% or totally healed policy; (3) statements of the defendant; and (4) the strength of the evidence as a whole. The following evidence should make out direct evidence under both an ADA claim and a retaliation claim for requesting accommodation and filing a charge. *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153 (8th Cir. 1990), cert. den'd 111 S.Ct. 150 (1990) (finding that where retaliation occurred, it was more likely the underlying discrimination had occurred too).

While defendant may have some arguments it can raise at trial, when the facts are viewed in the light most favorable to Funderburg: He went out on leave, and was told he had a job when he returned, even though it was known he would have significant restrictions after having fully recovered. There was evidence that he had been told he would have the IA job, and that it did not require the physical abilities of a patrol officer or narcotics detective. There was evidence that they would not return him to the position, and offered him another position in TRU, which he accepted. He then showed up for the March 23, 2017, was told they had no job for him, was treated with extreme hostility by Chief Whitfield, even being spat upon, and subjected to multiple, false accusations of impropriety related to misusing sick leave, not turning in a doctor's note, and showing up out of uniform. Whitfield then angrily walked out to go to lunch. Assistant Chief Sergeant then told Funderburg he would need a "total clearance" letter. Funderburg sent a letter immediately after, to Whitfield and HR Director Conaway, requesting that they

engage in the good-faith, interactive process, and did so twice more between March and Sep-tember.  They never met with him or called him. Then, shortly before Funderburg was fired, As-sistant Chief Sergeant called Funderburg in and told him that he could apply for a job as narcot-ics secretary, but that he would have to resign do so (false).  Sergeant then said the alternative was termination, and, that if Funderburg was fired, he could never be rehired (even though the alleged reason for termination would be missed work due to his disability, not misconduct or poor performance).  Funderburg at first declined because they said he was not guaranteed a job.  Then, the next day, he said he would resign and apply. Sergeant then told Funderburg he might not have to resign after all and Sergeant would get back to him.  Next thing Funderburg knows, he gets a letter saying he is fired, and specifically referencing "the letter from your doctor in reference to your surgery . . . ."  That fact pattern provides several kinds of direct evidence.

First, once the plaintiff requests accommodation, the parties must engage in an "interac-tive process" to determine what precise accommodations are necessary. See 29 C.F.R. § 1630.2(o)(3) & § 1630 App., § 1630.9; *accord Fjellestad v. Pizza Hut of Am., Inc*., 188 F.3d 944, 951 (8th Cir. 1999). "[F]or purposes of summary judgment, the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is pri-ma facie evidence that the employer may be acting in bad faith." *Fjellestad*, 183 F.3d at 952. Clearly, for more than six months, Defendant refused to engage in the good-faith, interactive process; by refusing to talk with him for six months; by repeatedly offering lesser physical jobs, and then and withdrawing them when Funderburg accepted them; and by making false state-ments about policies that Funderburg would have to quit to apply for other jobs and not being

rehireable if fired for health reasons (alternatively, if true, those policies would be discriminatory).

Second, Courts confronted with the issue of a requiring that an employee be 100%, have no restrictions or be capable of full duty, have found it to be a *per se* violation of the Americans with Disabilities Act as it precludes an individualized assessment of the employee's ability to do the job with reasonable accommodations.  *McGregor*, 187 F.3d at 1116; *Powers*, 667 F.3d at 819; *Duty*, 293 F.3d at 497; *Henderson,* 247 F.3d at 653.  Here, Sergeant told Plaintiff he had to have a total clearance letter, but admitted that Funderburg would have as good a chance as anyone to get the secretary job. Furthermore, the TRU, IA, and evidence jobs were non-physical.

Third, several statements and actions would constitute direct evidence, including: (1) Whitfield's hostility, false accusations, and spitting in the March 23 meeting; (2) Sergeant's total clearance statement; (3) the termination letter which directly connects the termination to Funderburg's health condition; (4) Sergeant's statement that to seek accommodation in the form of transfer, Funderburg must resign (if true, illegal); (5) Sergeant's statement that if Funderburg were fired for health reasons (not conduct or performance), he could never be hired by the city again (if true, illegal).  Defendant may argue that the termination letter is not an admission of disability discrimination, but simply articulates a legitimate, non-discriminatory reason for the termination.  But the problem with that is that there were multiple jobs plaintiff could do.  Some, such as the evidence and IA jobs are disputed, but even Defendant cannot seriously that Plaintiff could do the TRU and secretary positions, by virtue of the fact of having told Funderburg he could have those jobs.  The Third Circuit dealt with such a case in *Taylor v. Pathmark Stores, Inc*.:

> If an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a job, with or without accommodation,

the employer must be correct about the affected employee's ability to perform the job in order to avoid liability; there is no defense of reasonable mistake. Any other outcome would defeat the ADA's attempt to eradicate what may be deeply rooted and seemingly rational presumptions about the abilities of the disabled.

177 F.3d 180, 192-93 (3rd Cir. 1999); *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 644 (6th Cir. 2000); *Riemer v. Illinois DOT*, 148 F.3d 800, 806-07 (7th Cir. 1998)

Fourth, the evidence of these three things combined as a whole, along with other evidence of pretext or intent.  This would include: (1) requirements that Funderburg resign to request accommodation in the form of transfer to another job, and that if he was fired for health reasons (if false, evidence of pretext and a refusal to engage in a good-faith process, which cannot involve lying); (2) that Funderburg could not be rehired if fired for health reasons (not performance or conduct), which if false, evidences pretext); (3) repeatedly offering Funderburg jobs he could do, and then, when he accepts them, refusing to hire him.

### C.  Plaintiff easily makes out a *McDonnell Douglas* prima facie case

As described above in Section IV.A.2, Plaintiff can make out a prima facie *McDonnell Douglas* case on disability, by establishing protected status (undisputed), adverse action (undisputed), qualification (defendant disputes because of his disability), and some evidence of intent (which can be replacement, comparator, evidence of pretext, or direct evidence).

As to the qualification element, this has been discussed in Section I above as to disability. There were jobs available he could have been transferred to that he could do, and, as to retaliation, qualification is not required..

Plaintiff has established the light burden of the intent element at the prima facie stage by virtue of offering direct evidence or pretext.  *See Pye v. Nu Aire, Inc.,* 641 F.3d 1011 (8th Cir. 2011) (same evidence constituting direct evidence made out McDonnell Douglas case); Young, 152 F.3d at 1022 (pretext meeting that burden); *Landon*, 72 F.3d at 624 (same).   In addition to

what has been described above, other persons have been allowed to work despite having phys-

ical restrictions that prevented them from doing field work as police officers.

### D.  Defendant has failed to articulate a legitimate, non-discriminatory reason

Once Plaintiff makes out a prima facie case, Defendant has the burden of producing (but

not proving to be true) a legitimate, non-discriminatory reason, at which point, the plaintiff must

establish a fact question as to pretext.  Contrary to what most defendants think, the legitimate,

non-discriminatory reason must have certain minimal attributes to meet the defendant's burden

of production in the *McDonnell Douglas* process.  Defendant's reason in this case does not.  It

fails because it is based on inadmissible hearsay evidence, and because it does not explain a

reason Funderburg was treated the way he was.

"The defendant must clearly set forth, through the introduction of admissible evidence,

the reasons . . . ." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-256 (1981). "An ar-

ticulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden

merely through an answer to the complaint or by argument of counsel."  *Id*., n. 9; see also

*EEOC v. United Parcel Serv*., 94 F.3d 314, 316 n.2 (7th Cir. 1996). The proffered legitimate,

nondiscriminatory reason must be said to be the actual reason.  *In Joshi v. Florida St. Univ*.

*Health Ctr*., 763 F.2d 1227, 1233 (11th Cir. 1985), the defendant sought to defend by arguing

that other candidates had better qualifications than the plaintiff.  The Court stated the articula-

tion was "legally insufficient" because the Defendant had not actually considered the plaintiff's

qualification, and therefore the prima facie case stood unrebutted, and discrimination had been

established. Id. When the defendant attempted to rely on a reason that it did not know about at

the time of the decision, the articulation was held not to have been made, and discrimination

established, holding: "This Court has squarely held that an employer may not satisfy its burden of production by offering a justification which the employer either did not know or did not consider at the time the decision was made." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). The Court cannot be the one to articulate the legitimate, nondiscriminatory reason. *Coward v. ADT Sec'ty Sys., Inc.*, 194 F.3d 155, 159 (D.C. Cir. 1999); *Bell v. AT&T*, 946 F.2d 1507 (10th Cir. 1991); *Miller v. WFLI Radio, Inc.*, 687 f.2d 136 (6th Cir. 1982). The decisionmaker must be the one who offers the legitimate, nondiscriminatory reason. *IMPACT v. Firestone*, 893 F.2d at 1189, 1194 (11th Cir. 1994).

Thus, to the extent that Defendant is relying upon an articulation by Kelvin Sergeant, who was not Chief at the time, and did not make the decision, the articulation fails. To the extent Defendant relies on the letter by Chief Whitfield, the articulation fails, because that letter is hearsay.

The "defendant's explanation of its legitimate reasons must be clear and reasonably specific." *Burdine*, 450 U.S. at 258; *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995). In *King v. Trans World Airlines, Inc.*, the Eighth Circuit held that a legitimate, non-discriminatory reason must explain the reason for the treatment. If it does not, it fails:

> Appellant argued that TWA treated her differently in the hiring process, that the reason for this difference in treatment was sex, and that as a result TWA did not hire her. . . . TWA's articulated reasons for refusing to hire appellant do not explain why appellant was treated differently during the interview. *Cf. Ostroff v. Employment Exchange, Inc.*, 683 F.2d 302, 304 (9th Cir. 1982) (woman alleged sex discrimination when employment agency falsely told her that advertised position was filled without asking her about her qualifications; employment agency's defense that plaintiff was not qualified for position held irrelevant where plaintiff was summarily rejected without considering her qualifications); *Nanty v. Barrows Co.*, 660 F.2d 1327, 1332 (9th Cir. 1981) (employer summarily rejected qualified minority applicant without interview or opportunity to file application; employer's reasons why applicant would not have been hired did not explain why applicant was summarily rejected) . . .

> . . . .  None of the three reasons articulated by TWA explains why appellant's in-
> terview differed from those of other applicants. . . .
>
> Because TWA offered no reason to explain why appellant's interview was differ-
> ent, TWA in effect remained "silent in the face of the presumption [of unlawful
> discrimination]," *Texas Department of Community Affairs v. Burdine*, 450 U.S. at
> 254

*King*, 738 F.2d 255, 257-259 (8th Cir. Mo. 1984); *see also Tarshis v. Riese Org*., 211 F.3d 30,

36-37 (2nd Cir. 2000);  *McKenzie v. Renberg's, Inc*., 94 F.3d 1478, 1484 (10th Cir. 1996).

Here, Defendant has admitted there was another job available for Funderburg to do at

the time of his termination, that of narcotics secretary.  Funderburg was told that he would have

to quit to apply for it, and that if he did not, he would be fired, and could then never be hired by

the city again. Funderburg at first refused, because the job was not guaranteed, and he had

reason to distrust Whitfield.  But within one day, Funderburg told Sergeant he was willing to re-

sign and apply for the job.  Sergeant told Funderburg he might not have to, and that Sergeant

would get back with him.  Then they just fired Funderburg without getting back to him.  Defend-

ant's letter does not explain why Funderburg was not given the opportunity to try to get the sec-

retary job, or why it would be that if Funderburg got fired for health reasons he could never be

hired again (at least no legal reason).   Accordingly, given that the legitimate, non-discriminatory

reason fails, Plaintiff need not establish pretext.  *King v. Trans World Airlines, Inc*., 738 F.2d at

257-259 (entering judgment for plaintiff where a legitimate, non-discriminatory reason did not

meet requirements).

### E.  Plaintiff has established pretext

The same evidence that constitutes direct evidence makes out pretext.  The following

evidence should make out a case for pretext under both an ADA claim and a retaliation claim for

requesting accommodation and filing a charge.   *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153

(8th Cir. 1990), cert. den'd 111 S.Ct. 150 (1990) (finding that where retaliation occurred, it was more likely the underlying discrimination had occurred too).

False explanations are evidence of pretext. *Young*, 152 at 1023-24.   Defendants have claimed that Funderburg refused the TRU job, when the evidence is that he was offered it and accepted it right before the 3/23/17 meeting.  At that meeting, he was falsely accused of being out of uniform, of misusing leave, when Chief Whitfield himself told Funderburg to use that leave, and of not providing a doctor's note (undisputed that 3 were provided).  Plaintiff was told that he would have to resign to seek transfer elsewhere.  An employee cannot be forced to resign to get reasonable accommodation. They were either lying or imposing an illegal policy. Plaintiff was told, to pressure a resignation, that if he were fired for health reasons, he could never be rehired.  Once again, such a policy would be illegal, and they were either lying (showing pretext) or imposing an illegal policy (direct evidence).  They say that he had to meet physical requirements that he could not do for any job in the department, but the evidence is that certain jobs do not require that.

Failure to follow normal policies and procedures is evidence of pretext.  *Landon*, 72 F.3d at 624-25.  Assuming that these statements were false, and Defendant does not really have illegal policies of not rehiring anyone fired for health reasons and requiring people to resign to seek accommodation, they did not follow normal policies and procedures at the end of his employment.

Shifting explanations are evidence of pretext.  *Young*, 152 at 1023-24.  They offered him a job right before the 3/23/17 meeting, and then at the meeting, said there was no job. Right before termination, they offered him a secretary job, but said he must resign.  When he said he

would, they said he might not have to after all, and that they would get back with him. Then they just fired him.

Comments that do not rise to the level of direct evidence can still provide evidence of pretext. *Ryther v. KARE 11*, 108 F.3d 832, 844-845 (8th Cir. 1997) (en banc). Thus, even if the Court did not consider Whitfield's speech and demeanor toward Funderburg at the 3/23/17 meeting to be direct evidence, they would still be evidence of pretext.

A 100%/total clearance policy is a per se violation of the ADA, and it was specifically applied to Funderburg at the 3/23/17 meeting. Even if the court did not consider that to be direct evidence, it would evidence pretext.

A failure to engage in the good-faith, interactive process is prima facie evidence of bad faith. Over 6 months, despite three letters to the Chief and the HR Director, no one met or communicated with Funderburg to accommodate him, and when Sergeant met with Funderburg, all he did was attempt to coerce a resignation and lie to him about policy and procedure. This should be direct evidence, but if not, it is surely evidence of pretext.

Difference in treatment of Funderburg versus other people. Funderburg has identified people who could not handle field work, but have been allowed to work. See the picture of the man with the can, filed herewith.

WHEREFORE, PLAINTIFF PRAYS, that the Court deny summary judgment on his ADA, ACRA and Rehab Act claims for disability discrimination, failure to accommodate, and retaliation, and for FMLA retaliation.

Respectfully Submitted,

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
Post Office Box 2012
Benton, AR 72018
501-315-1910  Office
501-315-1916  Facsimile
Attorney for the Plaintiff

By:    _Lucien Gillham_
Lucien Gillham, Ark. Bar #99199
Lucien.gillham@gmail.com