# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

JEREMY FUNDERBURG                                                   PLAINTIFF

v.                                    Case No. 5:18-cv-00009 KGB

CITY OF PINE BLUFF, ARKANSAS                                      DEFENDANT

## OPINION AND ORDER

Before the Court is a motion for summary judgment filed by defendant City of Pine Bluff, Arkansas ("Pine Bluff") (Dkt. No. 7). Plaintiff Jeremy Funderburg responded in opposition, and Pine Bluff replied (Dkt. Nos. 15, 21). Also, by prior Order, this Court permitted Pine Bluff to amend its motion for summary judgment (Dkt. No. 29). Pine Bluff's amended motion for summary judgment is pending (Dkt. No. 31). Mr. Funderburg responded in opposition to the amended motion (Dkt. No. 35). Pine Bluff replied (Dkt. No. 39). For the reasons that follow, the Court grants Pine Bluff's motion for summary judgment and amended motion for summary judgment (Dkt. Nos. 7, 31).

In his complaint, Mr. Funderburg brings claims against Pine Bluff under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"); the Arkansas Civil Rights Act of 1993 ("ACRA"), codified at Ark. Code Ann. § 16-123-101, *et seq.*; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and he brings an illegal exaction claim. Pine Bluff seeks summary judgment on all of Mr. Funderburg's claims.

## I.      Factual Background

Unless otherwise noted, the following facts are pertinent to Mr. Funderburg's claims in dispute, taken from Mr. Funderburg's response, and what this Court construes as his supplement

response, to Pine Bluff's statement of uncontested material fact and statement of additional material facts (Dkt. Nos. 17, 37), or taken directly from record evidence presented to the Court.

## A.    Injury, Surgeries, And Restrictions

Mr. Funderburg came to work at the Pine Bluff Police Department on March 21, 2008 (Dkt. No. 37, ¶ 1).  In 2010, Mr. Funderburg was in a non-work-related accident in which he injured his neck and spine (*Id.*, ¶ 5).  Mr. Funderburg had a first surgery on his neck on August 17, 2016, after which he was off from work for a full month, and then he was told that he would have to see another doctor for further treatment of his condition (*Id.*, ¶ 6).  Mr. Funderburg underwent a second surgical procedure in about mid-November 2016, ultimately resulting in the fusion of his cervical and thoracic spine from C1 through T5 (*Id.*, ¶ 7).[1]  On January 4, 2017, the Mr. Funderburg's physician, Dr. Noojan Kazemi, released him to return to work on light duty (*Id.*, ¶ 8).  The Court notes that this release, by its terms, restricts Mr. Funderburg's activities for one month (Dkt. No. 9-1, at 91).

Mr. Funderburg brought the note from Dr. Kazemi to Ivan Whitfield, Acting Chief of Police ("Chief Whitfield") (Dkt. No. 37, ¶ 9).  According to Mr. Funderburg's affidavit, Lieutenant Ralph Isaac and Assistant Chief Kelvin Sergeant were also present (Dkt. No. 15-1, at 1).  According to Mr. Funderburg's deposition, Chief Whitfield said, "the letter wasn't good enough.  It didn't have enough information."  (Dkt. No. 9-1, at 38).  In response, Mr. Funderburg contends he said to Chief Whitfield, "I will call my doctor and you all can talk to him.  I said, I can't tell him what to put on that letter."  (*Id.*).    Lieutenant Isaac then said, "[W]e already tried.

---

[1]  Mr. Funderburg denies Pine Bluff's statement that the surgical procedure occurred in 2017 (Dkt. No. 17, ¶ 7).  The Court agrees.  Dr. Kazemi's progress note indicates that Mr. Funderburg came to the clinic on January 4, 2017, six weeks after the fusion of Mr. Funderburg cervical and thoracic spine from C1 through T5, meaning the surgical procedure occurred in mid-November 2016 (Dkt. No. 9-3).

[The doctor] won't tell us nothing." (*Id.*). According to Mr. Funderburg's affidavit, Chief Whitfield "had an abrupt and unpleasant manner with [Mr. Funderburg] in terms of his tone, rapidity of speech, facial expression and body language. It was clear that he was angry with [Mr. Funderburg]." (Dkt. No. 15-1, at 1). Mr. Funderburg also states in his affidavit that Chief Whitfield "said he needed a note and [Mr. Funderburg] asked to go to their doctor. The Chief said something to the effect that . . . it was on [Mr. Funderburg]." (*Id.*). Mr. Funderburg contends that he said okay and then left (Dkt. No. 37, ¶ 9).

Mr. Funderburg received two notes from physicians describing his physical limitations. One note from Dr. Scott Schlesinger, which is not dated but bears a facsimile mark of January 24, 2017, states:

> This patient underwent a posterior cervical decompression and fusion on 08/17/2016.
> The patient may return to his job at the police department in a desk job capacity only.
> Sedentary Work: Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time but may involve walking or standing for brief periods of time, Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*Id.*, ¶ 10; Dkt. No. 9-4).

Mr. Funderburg also had Dr. Nancy Williams, Mr. Funderburg's family doctor, fill out paperwork outlining his physical limitations (Dkt. No. 37, ¶ 11). That document also bears the facsimile mark of January 24, 2017 (*Id.*). Dr. Williams stated with regard to Mr. Funderburg's impairments that he: "Can't bend neck. Can't sit for more than 1 [hour]. Can't turn left or right." (Dkt. No. 9-5, at 1). She also stated that Mr. Funderburg: "Can't do job as vice narcotics detective. Couldn't defend self." (*Id.*, at 1). Further, she opined that with regard to Mr. Funderburg's job functions that he: "Can't turn neck. Can't afford for there to be any trauma to neck. Couldn't

drive police car. Couldn't be in pursuit. Couldn't apprehend a criminal." (*Id.*, at 2). She indicated

that Mr. Funderburg is limited to lifting no more than 20 pounds and that he cannot walk more

than 15 minutes at a time (*Id.*, at 1). She suggested that he not come into contact with criminals

(*Id.*, at 2). Finally, her recommendation was: "Please provide a desk job for patient." (*Id.*).

Dr. Williams also wrote a note dated January 24, 2017,[2] regarding Mr. Funderburg's

physical limitations:

> Mr. Funderburg, after two neck surgeries and a rod from C1 to T5 cannot perform
> the duties of a vice and narcotic detective. Any further injury to his neck could
> paralyze him. He is able to do a desk job and is very willing to do so. It is our hope
> that you can accommodate Mr. Funderburg with a job that will not put him at risk.

(Dkt. No. 9-1, at 90).

## B.    Temporary Light Duty

The Pine Bluff Police Department has a Temporary Light Duty Policy (Dkt. No. 37, ¶ 12).

The policy states, in relevant parts:

> III. DEFINITIONS
>
> ELIGIBLE PERSONNEL:   For purposes of this policy, any full-time sworn
> member of the Pine Bluff Police Department suffering from medically certified
> illness or injury requiring treatment of a licensed health-care provider and who,
> because of injury or illness is temporarily unable to perform the regular assignment
> but is capable of performing alternative assignments.
>
> . . .
>
> IV. PROCEDURES
>
>   A. GENERAL PROVISIONS
>
>       . . .

---

[2]   Dr. Williams' note is dated as "1-24-2016." (Dkt. No. 9-1, at 92). However, in his
deposition, Mr. Funderburg agreed that Dr. Williams' note was incorrectly dated as January 24,
2016, and should have been dated January 24, 2017 (*Id.*, at 43).

3.  No specific position within this agency shall be established for use as a temporary light- duty assignment, nor shall any existing position be designated or utilized exclusively for personnel on temporary light duty.

4.  Light-duty assignments are strictly temporary and normally should not exceed six months in duration. After six months, personnel on temporary light duty who are not capable of returning to their original duty assignment shall:

    a.  Present a request for extension of temporary light duty, with supporting documentation, to the chief executive officer or his designate; or

    b.  pursue other options as provided by employment provisions of this agency or federal or state law.

(*Id.*; Dkt. No. 9-6, at 1-2).

According to his deposition, Mr. Funderburg took his doctors' notes to Chief Whitfield who stated to Mr. Funderburg that "[t]here's no such thing as a light duty job where you will not be at risk." (Dkt. No. 37, ¶ 13; Dkt. No. 9-1, at 45). Mr. Funderburg admits that he took his notes to Chief Whitfield, that Chief Whitfield claimed there were no light duty jobs, and that he worked at the telephone reporting unit ("TRU") for a month (Dkt. No. 37, ¶ 13). While Mr. Funderburg worked the TRU job at that time, Pine Bluff had someone drive to pick him up for, and take him home from, work (Dkt. Nos. 9-1, at 52; 15-6, at 1). Mr. Funderburg denies that there were no light duty jobs available that he could do (Dkt. No. 37, ¶ 13). He contends that there was the TRU job, the internal affairs ("IA") job, and the evidence room ("Evidence") job (*Id.*). Further, he asserts that the policy allowed for six months (*Id.*).[3] According to his affidavit, Mr. Funderburg was

<hr />

[3] The Court understands this to be a reference to Pine Bluff Police Department's Temporary Light Duty Policy, which provides in part that light-duty assignments are strictly temporary, that they normally should not exceed six months in duration, and that specifies certain options for employees who, after six months on temporary light duty, are not capable of returning to their original duty assignment (Dkt. No. 9-6, at 1-2). The Court does not understand Mr. Funderburg to base any part of his ADA, Rehabilitation Act, or ACRA claims on the Temporary

informed "when [he] went for [his] surgery" that he "had the IA job," which "is a light duty job." (Dkt. No. 15-1, at 1). That parties dispute whether this offer was made and, if so, by whom. Mr. Funderburg acknowledges that some of his limitations might make it a little more difficult or cause Mr. Funderburg to do the job in a different way than a healthier person, but Mr. Funderburg contends that he could do these jobs (Dkt. No. 37, ¶ 13). Mr. Funderburg further states in his affidavit: "I have never, ever seen or heard of IA being called for an officer needs assistance or to a crime scene. I knew who the IA people were . . . and never saw them show up to anything." (Dkt. No. 15-1, at 1). He adds that this is also true of the Evidence job and administrative team (Dkt. No. 37, ¶ 13). In his affidavit, Mr. Funderburg also states that "[t]he IA job had not been filled at this time." (Dkt. No. 15-1, at 1).

Mr. Funderburg represents that, in response to the Equal Employment Opportunity Commission ("EEOC"), Pine Bluff represented that Mr. Funderburg "was advised that civilian employment was a possibility. . . if he was offered a non-uniformed position in TRU," a division of the Pine Bluff Police Department (Dkt. No. 37, ¶ 13). Mr. Funderburg maintains that Pine Bluff told the EEOC that "[h]e declined the position because he was not able to accrue the additional time (eight years) needed for him to tire under the LOPFI system." (*Id.*). In his response, Mr. Funderburg represents that he recalls the conversation about TRU but that his response was that he would take the job and that Chief Whitfield said he could have the job but "then did nothing." (*Id.*).

Based on the Court's review of the record evidence with respect to the TRU job, the parties appear to agree that there were two types of TRU jobs — Pine Bluff Police Department TRU jobs

---

Light Duty Policy nor does the Court construe the Temporary Light Duty Policy as a basis for such claims, given that the policy applies to temporary conditions.

and civilian TRU jobs. Mr. Funderburg requested in his March 23, 2017, letter that he be put into a TRU job with no reduction in pay, which the Court understands to be a Pine Bluff Police Department TRU job, or a TRU job with a reduction in pay, which the Court understands to be a civilian TRU job (Dkt. No. 9-1, at 101). This is consistent with Pine Bluff's discussion of these positions in its response to the EEOC (Dkt. No. 15-6). As for the Pine Bluff Police Department TRU job, Pine Bluff represented to the EEOC that it had no "Police Officer jobs that are permanently sedentary jobs that would fit the restrictions given to [Mr. Funderburg] by his Doctors." (Id., at 1). As for the civilian TRU job, Pine Bluff represented to the EEOC:

> The command staff explored options available to Officer Funderburg. He was advised that civilian employment was a possibility if he met the requirements for the position. During one such meeting with Chief Whitfield, Assistant Chief Sergeant, Deputy Chief Elliott, and Christian Funderburg (wife) he was offered a non-uniformed position in TRU division of the PBPD. He declined the position because he would not be able to accrue the additional time (eight years) needed to enable him to retire under the LOPFI system. He would be transferred to the non-uniformed retirement system. There is no mechanism to simultaneously be classified as a civilian, while continuing to contribute to LOPFI.

> Later that same day, Officer Funderburg further reviewed his options with Deputy Chief Elliot, separately. At that time, he learned that he could not simply transfer from a uniformed position to a non-uniformed position. He would be required to resign his law enforcement position and law enforcement certification. Moreover, it was reiterated that he would not be able to continue under the LOPFI retirement system.

(Dkt. No. 15-6).

Mr. Funderburg describes these options in his deposition, as well (Dkt. No. 9-1, at 56-61).

Specifically, in regard to being offered the civilian TRU job, Mr. Funderburg testified:

> When it come down to it, [Chief Whitfield] said . . . he would have human resources post it. I would have to resign from the PD because they're on a different retirement[], and he would get human resources to post it and then I – get me transferred over. He calls me on the phone – well, I call him on the phone to see if I could meet with him. He says, hey, it don't work like I thought it does. You're going to have to fill out an application and qualify, be able to type so many words a minute to get the job, but we'll talk about that in our meeting. . . .

(Dkt. No. 9-1, at 62).

Mr. Funderburg was given a job, however, for one month in the TRU. The TRU job is a job where people can come in off of the street and make complaints, and it is a sedentary office job (Dkt. No. 37, ¶ 14). When Mr. Funderburg initially came to work at the Pine Bluff Police Department the TRU jobs were given to a certified law enforcement officer who wore a police uniform to work and carried a sidearm (*Id.*, ¶ 15). That officer still functioned as a police officer if needed (*Id.*). According to Mr. Funderburg's affidavit, officers in the TRU worked a partial shift at TRU, but "even if there was a call out for officer needs assistance, [officers working TRU] did not leave." (Dkt. No. 15-1, at 2). When Mr. Funderburg was given the job in the TRU, he was aware that people who had been injured sometimes worked that job as light duty on a temporary basis (Dkt. No. 37, ¶ 16). When Mr. Funderburg worked the TRU job, it was a light duty job, and he was not allowed to wear a sidearm while performing that job (*Id.*, ¶ 17). At one point, Mr. Funderburg was told that he was going to be moved to the night shift in the TRU, to which Mr. Funderburg replied that he could not do that because he could not carry a gun or defend himself (*Id.*, ¶ 18). Mr. Funderburg also stated that he had already had to deal with someone involved in a homicide and someone who had become irate (*Id.*).

### C. Sick Time, Vacation Time, and FMLA

Mr. Funderburg then met with Chief Whitfield who told him that he would be paid for his sick time and his vacation time and that he should try to get his retirement and be humble (*Id.*, ¶ 19). According to Mr. Funderburg's affidavit, Chief Whitfield "did not say this in [a] friendly [manner], he was angry." (Dkt. No. 15-1, at 2). Mr. Funderburg avers that Chief Whitfield said go home, take your sick and your retirement, and that he thought Mr. Funderburg "would be more humble" (*Id.*).

After Mr. Funderburg used up his sick time and his vacation time, he had another meeting with Chief Whitfield, during which Chief Whitfield advised Mr. Funderburg that he should take FMLA leave if he could not come back to work as a police officer (Dkt. No. 37, ¶ 20).

Mr. Funderburg had a meeting on March 23, 2017, with Chief Whitfield (*Id.*, ¶ 21). On March 28, 2017, Mr. Funderburg sent a letter to Chief Whitfield and Vickie Conaway, Human Resources Director, describing his March 23, 2017, meeting with Chief Whitfield, in pertinent part:

> I reported to work on Thursday, March 23, 2017, and met with Chief Whitfield, I was immediately accused of "playing with" Chief Whitfield. I was then accused of being out of uniform, but that was my last uniform I was required to show up for work in, and the last unit I was assigned to. I was then accused of showing up to work without a release. I had previously given a release. I was then attacked as though I had misused sick time, I had not, I had done as Chief Whitfield instructed, because he had told me to use up my sick time and vacation. Furthermore, I do not see how I would not be entitled to sick leave if I was not being allowed to return to work based on my health problems. Then Chief Whitfield told me I was going to relieve myself of my duties. The Chief then claimed that he had no job for me. I was then accused of having a bad attitude and needing to be humble. The Chief then started saying things like I should do what I had to do, and he would do what he had to do. I asked If he wanted me to go to my doctor, and he said he wanted me to do what I wanted to do. He started saying things like he was going to make me fire myself. Now Chief Whitfield claims there is no job. During this meeting, the Chief stood over me, was angry, shook his finger at me, and threatened me by implying I was going to get myself fired. It is still not clear what I need to do. Chief Sergeant tried to guess, but was not sure, other than that I needed a total clearance letter and that I would probably be fired if I did not get one. They asked me what to do. Chief Whitfield just left. I was told to report the next morning.
>
> . . .

(Dkt. No. 9-1, at 98-99).

Mr. Funderburg states in his affidavit:

> My letter accurately describes this meeting. . . . A day or two before the meeting, I called Whitfield. Whitfield told me I could do the TRU position. I said [I] would. He never gave me that. When I arrived, Whitfield accused me of showing up out of uniform to work at his PD and said that I needed to write a memo. At the Pine Bluff PD, when a supervisor tells you something that like, in a situation like that, it means you are in trouble. Whitfield was in my face and was so angry he was

spitting in my face as he talked. I told him that unless I had been transferred and didn't know it, what I was wearing was appropriate for the last job I had, and so was considered to be showing up in uniform. He said he would make me fire myself. He said I had a bad attitude and needed to be humble. He stood over me and shook his finger at me. He walked out of the meeting and said that he had to go to another meeting. Right after I left the meeting I went to my food truck and saw him eating lunch at a nearby restaurant. Apparently he had a meeting with a piece of fish. He attacked me as though I had misused my sick time, and he told me to use up both vacation and sick time, and there was no question of my health problems being real. They had three notes. His tone in that meeting was angry and hateful. That came though in tone of voice, body language, facial expressions, emphasis on words and how quickly he spoke.

(Dkt. No. 15-1, at 2; *see also* Dkt. No. 37, ¶ 21).

Mr. Funderburg received a letter signed by Chief Whitfield and dated March 23, 2017, which states:

As of March 23, 2017, you have exhausted all of your paid leave time. The Pine Bluff Police Department does not have any job positions that are compatible with the restrictions listed in your latest Dr. Note [sic].

I am recommending that you go to Human Resources Department and apply for Family and Medical Leave, which will protect your job for 12 weeks.

(*Id.*, ¶ 22; Dkt. No. 9-7). Mr. Funderburg admits that he received this letter but denies that there were no jobs available (Dkt. No. 37, ¶ 22).

On March 28, 2017, Mr. Funderburg sent a letter to Chief Whitfield asking that he be given an IA job or given back a TRU job without a reduction in pay (*Id.*, ¶ 23). Mr. Funderburg denies that this is a complete description of the letter sent to Chief Whitfield and Ms. Conaway, which Mr. Funderburg claims he mailed three separate times (*Id.*). Mr. Funderburg's letter states, in pertinent part, that:

This is my request for accommodation and a complaint of discrimination and retaliation. . . .

I had been promised an Internal Affairs ("IA") job. I had interviewed for it and Lt. Edna Butler and Sgt. Jason Howard told me that I had the job. They knew about my injuries at the time, I was going to the job after surgery, and it was known that

I would come back with significant restrictions. Chief Hubanks had told them after the surgery that I would still have that job. They said there was a place for me to go, even though it was known I would not fully recover. This is because the IA job is not like a street job. You are in an office. You do interviews. You take complaints. You test new recruits.

. . .

I am requesting that I go back to my IA job as a reasonable accommodation immediately. Failing that, I request that I be put in TRU, without a reduction in pay, given that I could be in the IA job. Failing that, I request that I bet [sic] put in TRU, even if there is a reduction in pay. Failing that, I request any open position at the City that I am qualified to do. I am not waiving my rights by accepting a job other than IA. If I do not work in law enforcement I can lose my certification. TRU pays less normally. There is a good chance that any non-law enforcement job will pay less, I am requesting that you engage in a good-faith interactive process.

(Dkt. No. 9-1, at 98-99). Mr. Funderburg claims that he sent this letter to Chief Whitfield and to Ms. Conaway in Human Resources (Dkt. No. 37, ¶ 23).

Also on March 28, 2019, Mr. Funderburg filed an EEOC charge alleging disability discrimination and retaliation (Dkt. No. 9-1, at 104).

On April 5, 2017, Dr. Williams filled out paperwork in order for Mr. Funderburg to request FMLA leave, which basically reiterated the restrictions she outlined in her January report (Dkt. No. 17, ¶ 24). Mr. Funderburg then applied for FMLA leave on or about April 5, 2017, and that leave was granted (*Id.*, ¶ 25). Mr. Funderburg took the full 12 weeks of FMLA leave (*Id.*, ¶ 26). Mr. Funderburg admits all of this with respect to FMLA leave, but he claims that there were light duty jobs available in the Pine Bluff Police Department and the City, that he had requested those jobs, and that he asked Pine Bluff to engage in the interactive process (*Id.*, ¶ 23).

### D.    Duties Of A Pine Bluff Police Department Officer

According to the City of Pine Bluff's description for the position of "Patrol Officer," the physical requirements of a patrol officer are:

**PHYSICAL DEMANDS**

The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions and expectations.

While performing the functions of this job, the employee is regularly required to talk or hear. The employee frequently is required to stand, walk, and sit. The employee is occasionally required to use hands to finger, handle, or feel; reach with hands and arms; climb or balance; stoop, kneel, crouch, or crawl; and taste or smell. The employee must regularly lift and/or move more than 100 pounds. Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception, and ability to adjust focus.

The incumbent must be able to perform the following: physical and mental stamina to fire weapons, react and move rapidly from sedentary to active condition in response to environmental situations, assume a variety of bodily positions and postures necessary to employ "cover and concealment" during a deadly force encounter, respond to a physical attack and possess the ability to escape attacker, subdue attacker and/or summon aid. Must be able to react quickly and efficiently in all emergencies, natural or man-caused disasters.

(Dkt. No. 9-11, at 6-7).

According to the Pine Bluff Police Department Policy and Procedures Manual ("Manual"),

Policy Number 192, "[i]n order to maintain an efficient and vigilant police department, any officer

may be transferred to any job assignment at any time as required by the needs of the department."

(Dkt. No. 9-10, at 1). Under the section titled "Duties and Powers," the Manual states that police

officers have a duty to "[p]ursue and arrest any person fleeing from justice in any part of this state

. . . [and] [a]pprehend any and all persons in the act of committing any offenses against the laws

of the state or ordinances of the City of Pine Bluff . . . ." (*Id.*, at 2). The Manual also states that

police officers must be able to "sit for extended periods of time" under the sections titled: "Drive,

Operate, and Maintain Departmental Vehicles in Routine and Emergency Situations"; "Conduct

Investigations and Interviews"; and "Perform Patrol Duties." (*Id.*, at 3-4, 5). Under the section

titled "Using Force," the Manual states that police officers must have the "ability to restrain

persons and to do so in a manner consistent with department policy and state and constitutional

laws; encountering life-threatening situations and being able to use force for self-protection and to protect other officers and citizens . . . ." (*Id.*, at 5). Under the section titled "Job Functions— Effecting Custodial Arrests," the Manual lists "running" and "climbing" as standards for officers in pursuit during a custodial arrest (*Id.*, at 2).

Pine Bluff contends that Pine Bluff Police Department Policy No. 192 sets out the essential functions of a police officer and mandates that all police officers may be transferred to the duties of a patrol officer at any time (Dkt. No. 37, ¶ 27-32). Mr. Funderburg denies that the physical requirements of a patrol officer outlined in the Manual are an actual or essential job function for all officers (*Id.*). In his affidavit, Mr. Funderburg states that the IA position is not: "I was familiar with the IA job, and it is a sedentary desk job. You are not patrolling. You are not called out to scenes. You are called out for officer needs assistance calls. You are dealing mostly with other police officers, in your office, at the PD." (Dkt. No. 15-1, at 2-3).

In his deposition, regarding the policy that any officer may be transferred at any time, Mr. Funderburg stated, "as far as I know, I ain't never seen an evidence guy show up on a code 1100 [code for officer needs help], and the policy says all officers shall respond on duty. Evidence works days, so I know they're there. That's the same way with administration." (Dkt. No. 9-1, at 57-58). In his deposition, Mr. Funderburg further stated, "It says all sworn officers shall respond to a code 1100. You never see administration there at all. You never see [internal affairs and evidence] there . . . So I can perform evidence or I can perform IA. They never show up to anything." (*Id.*, at 58). In his deposition, Mr. Funderburg also stated, "I could not be a patrol officer. There [are] jobs I could be." (*Id.*, at 60).

In his deposition, regarding calls for "officer needs help," Mr. Funderburg agreed that "the first line of defense is going to be the uniformed patrol officers in the marked units." (*Id.*, at 58).

Mr. Funderburg stated that "[t]hey could" when asked "if they needed help, they could call on whoever is working in IA or in evidence; correct?" (*Id.*). Mr. Funderburg also agreed that "if [IA and evidence officers] were called upon to attend to such a situation, they would be expected to do so . . . ." (*Id.*, at 58-59). Mr. Funderburg agreed that IA and Evidence were "jobs that are—at the time were [] manned by people that were certified officers." (*Id.*, at 55). Mr. Funderburg agreed that "[i]f the Chief so desired, [] any of those officers [could] be taken out of IA and put back into patrol," and the same would apply to the evidence officers (*Id.*, at 56). When asked, "were any of [the IA or Evidence officers] on any sort of restricted duty or light duty status," Mr. Funderburg stated, "Not that I know. Not to my knowledge." (*Id.*, at 56-57). Mr. Funderburg stated that, if called upon, he would always try to assist another officer, but that if he were to get into a physical altercation, given his physical condition, he would be at risk of getting paralyzed (Dkt. No. 37, ¶ 33). Mr. Funderburg further stated that he is not physically capable of being a patrol officer (*Id.*).

According to Pine Bluff, the Arkansas Commission for Law Enforcement Standards and Training ("CLEST") Regulation Section 1002 sets out the minimum standards for a law enforcement officer in the State of Arkansas. Section 1002(3)(g) states:

> (3) Every officer employed by a law enforcement agency shall:
>
> . . .
>
> (g) Be examined by a licensed physician and meet the physical requirements prescribed in Specification S-5, Physical Examination.

(*Id.*, ¶ 34; Dkt. No. 9-12, at 1-2). Section 1002(3)(g) of the Regulations is supplemented by Specification S-5, according to Pine Bluff (Dkt. No. 9-13). It is in keeping with the concept that in order to render proper service to the community, a law enforcement officer must be physically sound and free of any defect which might adversely affect the performance of duty (Dkt. No. 37,

¶ 35).  The officer's personal safety and the safety and lives of others will be endangered if these important physical qualifications are not met (*Id.*).  Specification S-5 states, in pertinent part:

> REQUIREMENTS
>
> (1)  Medical examination administered by a licensed physician.
>
> . . .
>
> (5)  For all law enforcement officers employed under the Act, retention on a permanent basis by the employing agency will depend on the satisfactory results of the physical examination.
>
> (6)  The physician's report after examination must conclude and clearly state that, in his opinion, the applicant has the ability to physically perform the duties of a law enforcement officer in the State of Arkansas.

(*Id.*, Dkt. No. 9-13, at 1-2).  Mr. Funderburg has not provided the Pine Bluff Police Department with a physician's report in compliance with CLEST Specification S-5 clearly stating that it is the physician's opinion that he can physically perform the duties of a law enforcement officer (Dkt. No. 37, ¶ 36).

In response to these allegations, Mr. Funderburg contends that "the regulation says what i[t] says" (*Id.*, ¶ 34).  He claims that nothing in Section 1002 lists what physical requirements must be met and that Specification S-5 only lists specific requirements as to hearing and vision, which he contends he could meet (*Id.*).  He maintains that Section 1002 indicates that accommodations can be made and standards waived (*Id.*).  Further, in regard to obtaining a physician's report, Mr. Funderburg represents that he asked Chief Whitfield to go to "their doctor," but his request was denied (*Id.*).  He claims he never received a particular form to fill out, request to see a particular doctor, or a request to provide particular information (*Id.*).  He asserts that he requested Pine Bluff engage in the good-faith interactive process, but he claims Pine Bluff refused (*Id.*). He maintains that there were jobs he could have done, including IA, TRU, or Evidence jobs (*Id.*).

### E. Termination

On September 5, 2017, Mr. Funderburg received a letter from Chief Whitfield[4] stating that:

> We received the letter from your doctor in reference to your surgery and your inability to return to work as a police officer. You have exhausted all available leave time.

> In light of the fact that you are unable to perform duties as a police officer, your employment with the Pine Bluff Police Department is terminated effective this date. You have the option to apply for any civilian positions that may be open within the City.

(Id., ¶ 38; Dkt. No. 9-15). Mr. Funderburg admits receiving the letter and that these are the contents (Dkt. No. 37, ¶ 38). He disputes the facts as represented in the letter (*Id.*).

According to the declaration of Kelvin Sergeant, former Assistant Chief and then-current Police Chief for the City of Pine Bluff, Arkansas ("Chief Sergeant"), "[a]t the time that Jeremy Funderburg was terminated on September 5, 2017, there were no open or available positions in internal affairs or evidence and Mr. Funderburg had already expressed his unwillingness to continue in the telephone reporting unit unless he could do the job as a police officer." (Dkt. No. 9-14, ¶ 10). In his declaration, Chief Sergeant also stated, "[a]t or near the time that Jeremy Funderburg was terminated, there was an opening available for a civilian job as a secretary in the vice and narcotics unit and I personally made Mr. Funderburg aware of that position. Mr. Funderburg, however, did not apply for that job." (*Id.*, ¶ 12).

To an extent, Mr. Funderburg disputes these representations made by Pine Bluff (Dkt. No. 37, ¶¶ 39-40). In his affidavit, Mr. Funderburg states that, as to IA, he was told he would have the job after his return from surgery, even though he claims it was known that he would have

---

[4] To the extent Mr. Funderburg objects to this letter being considered by the Court at this stage of the proceeding, the Court overrules his objection. The Court concludes that, under Federal Rule of Civil Procedure 56(c)(2), this letter could be presented in a form that would be admissible in evidence and, therefore, may be considered by the Court.

significant restrictions (Dkt. No. 15-1, at 4). He claims that he did not refuse to work in TRU but instead claims that, despite already having three notes regarding restrictions, Chief Whitfield asked for another note for light duty (*Id.*). Mr. Funderburg claims that he had already given Chief Whitfield doctor's notes, including one that said "light duty" and "desk job." (*Id.*).

With respect to a civilian job as a secretary in the vice and narcotics unit, Mr. Funderburg claims that, when asked, he went in to speak with Deputy Chief Elliott and Chief Sergeant (*Id.*). He claims that, during that meeting, he was told that there were a couple of jobs coming available, including a civilian job in vice and narcotics. Mr. Funderburg admits that he was told that he could apply, but he claims he was informed he would have to resign from the Police Department before he could apply (*Id.*). He maintains that he asked if he could be guaranteed to get the job (*Id.*). When Mr. Funderburg was told that there were no guarantees but that he had as good a chance as anyone, Mr. Funderburg refused to resign without knowing whether he would have a job or not (*Id.*). He also cited his treatment by Chief Whitfield as factoring into his refusal to resign (*Id.*). Mr. Funderburg claims that, the next day, he spoke to Chief Sergeant and told him that he was willing to resign to apply for a job (*Id.*). Mr. Funderburg claims that he was then told that he might not have to resign, that Chief Sergeant would look into the matter, and that he would get back to Mr. Funderburg (*Id.*). Mr. Funderburg claims that no one ever got back to him and that, instead, the next thing he heard was in regard to his termination letter (*Id.*).

In his deposition, Mr. Funderburg agreed that his termination letter "says that [Mr. Funderburg] has the option to apply for any civilian position that may be open within the city." (Dkt. No. 9-1, at 69). Mr. Funderburg agreed that he had not applied for any civilian position (*Id.*). Mr. Funderburg stated that Chief Sergeant "told me if I was terminated from the police department, I would never be able to apply and get a job with the City of Pine Bluff." (*Id.*, at 69-

70). When asked if he knew "Kelvin Sergeant wouldn't have any say so with regard to . . . hiring decisions in [] the street department," Mr. Funderburg responded, "Not that I know of." (*Id.*, at 70). Mr. Funderburg further stated that he had "not applied for any [City of Pine Bluff] job," since his termination on September 5, 2017 (*Id.*, at 70-71). Mr. Funderburg stated that he "applied for a manger's job at Tyson . . . [and] for loss prevention with J. C. Penney's." (*Id.*, at 71). At the time of his deposition, Mr. Funderburg had not "filled out a job application anywhere in the last five or six months [that he knew of]." (*Id.*, at 72).

### F.      Additional Information From Mr. Funderburg

In further support of his response to Pine Bluff's motion for summary judgment, Mr. Funderburg asserts the following (Dkt. Nos. 15-1; 37, at 19-20). Until the conversation with Chief Sergeant, not long before his termination, Mr. Funderburg contends that he was never told to apply formally for any position (*Id.*). According to Mr. Funderburg, he would have if they asked (*Id.*). After the March letter, until Chief Sergeant spoke with Mr. Funderburg about the secretary position, Mr. Funderburg contends that no one spoke with Mr. Funderburg about any positions in the City of Pine Bluff, in or out of the Pine Bluff Police Department (*Id.*).

Early on in the process of Mr. Funderburg trying to return to work, according to Mr. Funderburg, Lieutenant Isaac said "things are about to get sh--ty around here" and to leave him out of it, when talking with Mr. Funderburg about his health issues and returning to work (*Id.*).

Mr. Funderburg claims that Melissa Johnson is an officer with the Pine Bluff Police Department (*Id.*). She was off-duty for 10 months because she had a baby who could not go to day care (*Id.*). Whitmore had physical disabilities, and has to walk with a cane, meaning he

surely cannot run down criminals and fight.  Yet he was allowed to work in administration (*Id.*).  David DeFoor could not work the street due to colitis, yet was allowed to work in the training division (*Id.*).  Jose Thompson had gout and could not work the streets.  Mr. Funderburg claims that he mentioned this to Chief Whitfield on one occasion, and Chief Whitfield said do not worry about him (*Id.*).  Thompson was sent out on patrol briefly after this conversation, then went back to administration (*Id.*).

Mr. Funderburg claims that there was no policy requiring that Mr. Funderburg quit before being allowed to apply for a different job but cites only his own affidavit and discovery responses in support (*Id.*, at 20).  Mr. Funderburg also maintains that he was a good officer, with good ratings, including as a detective for narcotics and vice (*Id.*).

## II.     Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Hollway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), cert. denied, 522 U.S. 1048 (1998).  "The evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co.*, 121 F.3d at 366. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III.     Illegal Exaction Claim

Mr. Funderburg brings an illegal exaction claim in his complaint (Dkt. No. 2, 4-5). Pine Bluff moves for summary judgment on this claim, arguing that Mr. Funderburg lacks standing and any evidence to support this claim (Dkt. No. 8, at 1-2). In response, Mr. Funderburg moves to dismiss the illegal exaction claim without prejudice (Dkt. No. 15, at 1). The Court dismisses without prejudice Mr. Funderburg's illegal exaction claim.

### IV.     Discrimination Under The ADA, The Rehabilitation Act, And The ACRA

Mr. Funderburg claims that Pine Bluff discriminated against him on the basis of his disability, failed to engage in good faith efforts to accommodate his disability, and retaliated against him for requesting accommodations. Mr. Funderburg brings claims under the ADA, the

Rehabilitation Act,[5] and the ACRA (Dkt. No. 2).  To the extent Mr. Funderburg brings these claims alleging discrimination based on disability, the same analysis applies with respect to the *prima facie* case and the summary judgment issues to all three types of claims, so cases discussing such claims are interchangeable.  *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006) (examining the ADA and the Rehabilitation Act); *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) (examining the ADA and the ACRA).  Pine Bluff moves for summary judgment on all claims.

To establish discrimination on the basis of a disability, an employee must show that he: (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of his disability.  *Huber v. Wal–Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007).  If the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the employer to show a nondiscriminatory reason for the adverse action and then back to the plaintiff to show that the articulated reason is merely a pretext for discrimination.  *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).  "The plaintiff retains at all times the ultimate burden of proving that the adverse employment action was motivated by intentional discrimination." *Id.*

### A.    Qualified Individual And Essential Functions Of The Job

To be a qualified individual under the ADA, an employee must:  (1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential

---

[5]  Section 504 of the Rehabilitation Act prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. *Jim C. v. United States*, 235 F.3d 1079, 1080 (8th Cir. 2000) (citing 29 U.S.C. § 794(a)).

job functions, with or without reasonable accommodation. *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013).

Mr. Funderburg fails to state a *prima facie* case of disability discrimination in part because he cannot perform the essential functions of the job he held with Pine Bluff. Essential functions of a position are the fundamental duties of the job, but not its marginal functions. *Id.* at 1217. A job function may be essential if the reason the position exists is to perform that function or if a limited number of employees are available among whom the performance of that job function can be distributed. *Id.*

Although not conclusive, the Eighth Circuit Court of Appeals considers the employer's judgment of what constitutes an essential function "highly probative." *Scruggs v. Pulaski Cty., Ark.*, 817 F.3d 1087, 1093 (8th Cir. 2016) (citing *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 786 (8th Cir.2004)). The Eighth Circuit has previously determined that a plaintiff's "specific personal experience is of no consequence in the essential functions equation." *Dropinski v. Douglas Cty., Neb.,* 298 F.3d 704, 709 (8th Cir. 2002). Instead, courts are to consider the written job description, the employer's judgment, and the experience and expectations of all employees in that position generally to assess the essential functions of the job. *Id.*

In *Benson v. Northwest Airlines, Inc.*, the Eighth Circuit Court of Appeals held that determining whether physical qualifications are essential job functions "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." 62 F.3d 1108, 1114 (8th Cir. 1995) (quoting *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988)). The Eighth Circuit elaborated on the holding from *Benson* in *Faulkner v. Douglas County Nebraska*, 906 F.3d 728 (8th Cir. 2018). In that case, a former correctional officer sued for disability discrimination under the ADA

claiming that the employer could have accommodated her disability by placing her in a position in the prison lobby where she would not have any contact with inmates. *Id.*, at 733. The Eighth Circuit found that, based on the employer's job description, an essential job function of correctional officers assigned to the lobby included the "ability to restrain offenders or stop disturbances with use of force." *Id.*, at 733-34. The Eighth Circuit held that plaintiff's "suggested accommodation[s] were not ones that would enable her to perform the essential functions of the [correctional officer] position." *Id.*, at 734.

Based on the record evidence, construing all inferences in the light most favorable to Mr. Funderburg, the Court concludes that the essential functions of a Pine Bluff Police Department officer, the job Mr. Funderburg held before his injury and surgeries, require being physically capable of performing the job functions set out in Policy No. 192. Those essential functions include that all officers are subject to being transferred to patrol duties at any time; that all officers must be able to come to the aid of another officer or member of the public, pursue and apprehend a criminal, use force to restrain subjects, and to protect the officer or others; or to assist with natural or man made emergencies. To reach this conclusion, the Court relies on Pine Bluff's assessment of what are the essential job functions of a Pine Bluff Police Department patrol officer, including what is stated in Policy No. 192; the Arkansas Commission on Law Enforcement Standards and Training Regulation (CLEST) Section 1002 and Specification S-5 with respect to the qualifications necessary to be a law enforcement officer in the State of Arkansas; and the record evidence regarding the experience and expectations of all employees in that position generally.

Because the Court determines that essential job functions of Pine Bluff Police Department officers are set out in Policy No. 192 which mandates that all police officers may be transferred to the duties of a patrol officer at any time, the Court determines that IA, TRU, and Evidence positions

with the Pine Bluff Police Department all had these same requirements. During his deposition, regarding calls for "officer needs help," Mr. Funderburg agreed that "the first line of defense is going to be the uniformed patrol officers in the marked units." (Dkt. No. 9-1, at 58). When specifically asked whether "if they needed help, they could call on whoever is working in IA or in evidence," Mr. Funderburg responded that they could (*Id.*). He also agreed that, "if [IA and evidence officers] were called upon to attend to such a situation, they would be expected to do so . . . ." (*Id.*, at 58-59). Further, in his deposition, Mr. Funderburg agreed that IA and Evidence were "jobs that are—at the time were [] manned by people that were certified officers." (*Id.*, at 55). He also agreed that "[i]f the Chief so desired, [] any of those officers [could] be taken out of IA and put back into patrol," and the same would apply to the evidence officers (*Id.*, at 56).

The undisputed record evidence is that Mr. Funderburg could not, and cannot, perform these essential functions of a patrol officer without reasonable accommodation. All doctors placed great limitations on his physical abilities as indicated by their notes in the record evidence, and Mr. Funderburg acknowledges that he is at risk of being paralyzed if he gets into a physical altercation.

### B. Reasonable Accommodation And The Interactive Process

After determining the essential functions of the job, the Court next examines whether Mr. Funderburg has made a facial showing that a reasonable accommodation would enable him to perform his essential job functions. Under the ADA, an employer is required to provide reasonable accommodation to the known physical limitations of an otherwise qualified employee with a disability, unless doing so would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); *see also Kowitz v. Trinity Health*, 839 F.3d 742, 745 (8th Cir. 2016). "Discrimination includes 'not making reasonable accommodations to the known physical or

mental limitations of an otherwise qualified individual with a disability. . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" *Dropinski,* 298 F.3d at 707 (quoting *Heaser v. The Toro Co.,* 247 F.3d 826, 830 (8th Cir. 2001)) (alterations in original)).

"To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and employee to engage in an 'interactive process.'" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015) (quoting *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009)). An employee alleging that his employer did not engage in this interactive process must show: (1) the employer knew about his disability, (2) he requested accommodation, (3) the employer did not make a good-faith effort to assist him in seeking accommodation, and (4) he could have been reasonably accommodated but for the employer's lack of good faith. *Peyton*, 561 F.3d at 902.

Although an employer must converse or interact with the individual about the availability of a reasonable accommodation, "an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999). The employer must make a good faith effort to assist the employee in finding an accommodation, but the employee must show that he could have reasonably been accommodated if not for the employer's lack of good faith. *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 943-44 (8th Cir. 2018) (en banc). Specifically, there is no *per se* liability if an employer fails to engage in an interactive process, but the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is *prima facie* evidence that the employer may be acting in bad faith. *Hill*, 737 F.3d at 1218 (citing *Kallail v.*

*Alliant Energy Corporate Servs., Inc.*, 691 F.3d 925, 933 (8th Cir. 2012) (internal quotation and citation omitted)).

Thus, if Mr. Funderburg cannot show that there was a reasonable accommodation available, Pine Bluff is not liable for failing to engage in the good-faith interactive process. *Scruggs*, 817 F.3d at 1094; *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 864 (8th Cir. 2006) ("Under the ADA, if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process."); *Dropinski*, 298 F.3d at 709-10 (holding that a discussion of the interactive process is "superfluous" where the worker cannot perform the essential job duties, and any accommodation would result in job restructuring).

An employer is not required to provide the specific accommodation requested or preferred by an employee. *Scruggs*, 817 F.3d at 1093 (citing *Cravens v. Blue Cross & Blue Shield of Kan. City,* 214 F.3d 1011, 1019 (8th Cir. 2000)). Rather, an employer only has to provide an accommodation that is reasonable. *Id.* An accommodation is not reasonable if it does not permit the plaintiff to perform the essential functions of his job with that accommodation. *Id.* (citing *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003)).

Mr. Funderburg must carry the burden on reasonable accommodation, and the Court determines that he fails to do so on the record evidence. The Court determines that Pine Bluff Police Department Policy No. 192 sets out the essential functions of a police officer and mandates that all police officers may be transferred to the duties of a patrol officer at any time (Dkt. No. 37, ¶ 27-32). To the extent Mr. Funderburg contends that he was offered a restructured job with the Pine Bluff Police Department that would permit him to work at a desk and not meet the essential functions of a police officer, or argues that he should have been given such an offer, the Court rejects that such a restructured job represents a reasonable accommodation of his former job. *See*

*Lloyd v. Hardin County, Iowa*, 207 F.3d 1080, 1084 (8th Cir. 2000). The Court determines that Pine Bluff "cannot be required. . . to provide him with such a position—because that would necessarily entail reallocating one or more of the essential functions" of the job which a qualified individual must perform. *Id.* Current law does not require this of an employer. *Id.* (citing *Benson*, 62 F.3d at 1112-13 ("An employer need not reallocate the essential functions of a job, which a qualified individual must perform."); *Fjellestad*, 188 F.3d at 954 ("We must emphasize. . . that by requiring the employer to engage in the interactive process, we do not hold that any particular accommodation must be made by the employer. The employee still carries the burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the essential functions of the job.").

The Court determines that Mr. Funderburg's case is like *Faulkner*, in which the Eighth Circuit found that, based on the employer's job description, an essential job function of correctional officers assigned to the lobby included the "ability to restrain offenders or stop disturbances with use of force." 906 F.3d at 733-34. As a result, the Eighth Circuit rejected plaintiff's argument that the employer could have accommodated her disability by placing her in a position in the prison lobby where she would not have any contact with inmates because her "suggested accommodation[s] were not ones that would enable her to perform the essential functions of the [correctional officer] position." *Id.*, at 734.

As a result, even though the parties may dispute whether Mr. Funderburg was ever offered a restructured job with the Pine Bluff Police Department that would permit him to work at a desk and not meet the essential function physical demands of the job; should have been offered such a job; who purportedly made such an offer; or who purportedly should have made such an offer,

these factual disputes are not material to the outcome of Mr. Funderburg's disability discrimination case and do not prevent this Court from granting summary judgment in favor of Pine Bluff.

There is record evidence that requiring Pine Bluff to make such an accommodation for Pine Bluff Police Department officers would impose an undue hardship on the employer. If the Pine Bluff Police Department were to employ an officer unable to perform the duties listed in Policy No. 192, it would put the public and fellow officers at risk. Moreover, Pine Bluff would have to pay for training for the employee through the use of taxpayer funds that would not be of benefit to the employee or to the public because the employee would be unable to implement the training and perform the duties listed in Policy No. 192.

Mr. Funderburg makes several arguments about reassignment. With respect to reassignment, "the disabled employee must be seeking an existing position within the company; the employer is not required to create a new position as an accommodation." *Cravens*, 214 F.3d at 1019. The employer also is not required to "'bump' another employee in order to reassign a disabled employee to that position." *Id.* The disabled employee must be "qualified" for the alternative position, meaning able to satisfy the legitimate prerequisites for the alternative position and able to perform the essential functions of the alternative position with or without reasonable accommodation. *Id.* at 1019-20.

Even if this Court were to assume for purposes of deciding this motion that IA, TRU, and Evidence jobs did not have the requirements of Policy No. 192 as essential functions, Mr. Funderburg has not demonstrated through record evidence that there were open or available jobs in IA, Evidence, or TRU at the time of his termination. Further, Mr. Funderburg has not explained why Pine Bluff should be required to employ him in a TRU job – a Police Department TRU job or a civilian TRU job – when he previously refused to continue in such a job. All parties agree

that Mr. Funderburg was given a job for one month in the TRU. When Mr. Funderburg was given the job in the TRU, he was aware that people who had been injured sometimes worked that job as light duty on a temporary basis (Dkt. No. 37, ¶ 16). When Mr. Funderburg worked the TRU job, it was a light duty job, and he was not allowed to wear a sidearm while performing that job (*Id.*, ¶ 17). At one-point, Mr. Funderburg was told that he was going to be moved to the night shift in the TRU, to which Mr. Funderburg replied that he could not do that because he could not carry a gun or defend himself (*Id.*, ¶ 18). Mr. Funderburg also stated that he had already had to deal with someone involved in a homicide and someone who had become irate (*Id.*).

To the extent Mr. Funderburg claims that he was offered a civilian TRU job, with respect to this offer, Mr. Funderburg testified:

> When it come down to it, [Chief Whitfield] said . . . he would have human resources post it. I would have to resign from the PD because they're on a different retirement[], and he would get human resources to post it and then I – get me transferred over. He calls me on the phone – well, I call him on the phone to see if I could meet with him. He says, hey, it don't work like I thought it does. You're going to have to fill out an application and qualify, be able to type so many words a minute to get the job, but we'll talk about that in our meeting. . . .

(Dkt. No. 9-1, at 62). It is undisputed that Mr. Funderburg never filled out an application for a job with Pine Bluff.

To the extent Mr. Funderburg claims that there were available jobs in IA, Evidence, and TRU that he could perform "because a number of persons could not work the street due to health problems but were allowed to continue" (Dkt. No. 36, at 16), Mr. Funderburg presents no record evidence that the individuals he references had any conditions or restrictions, or had anything other than temporary conditions or restrictions, on their ability to perform the essential functions of a Pine Bluff Police Department officer. In other words, Mr. Funderburg attempts to claim that these individuals were similarly situated to him and that he should have been afforded the same

opportunities.  There is insufficient record evidence for this Court to determine that these individuals were similarly situated to Mr. Funderburg or were being accommodated as qualified individuals with a disability in the way Mr. Funderburg contends.  These allegations do not salvage his failure to accommodate claim.

Moreover, although he claims to have written letters to Chief Whitfield and Ms. Conaway in Human Resources requesting consideration for any open positions for which he was qualified with his restrictions, Mr. Funderburg fails to submit record evidence that there were any open positions in Pine Bluff for which he was qualified with his restrictions during the relevant period or even at the time of his termination.

Undisputed record evidence demonstrates that, at or near the time Mr. Funderburg was terminated, there was an opening available for a civilian job as a secretary in the vice and narcotics unit.  Undisputed record evidence demonstrates that Chief Sergeant personally informed Mr. Funderburg of this opening and informed Mr. Funderburg that he could apply for the position. Undisputed record evidence demonstrates that Mr. Funderburg did not apply for this position. There also is record evidence that Pine Bluff through its Human Resources Department posts job openings (Dkt. No. 9-1, at 61).  These undisputed facts do not support Mr. Funderburg's failure to accommodate claim.

Mr. Funderburg attempts to avoid the consequence of his failing to apply for the position or any other position with Pine Bluff by suggesting that his failure to apply formally should be excused by this Court.  He asserts that his application would have been futile due to Pine Bluff's purportedly discriminatory practices, *see Braziel v. Loram Maint. of Way, Inc.*, 943 F. Supp. 1083, 1100 (D. Minn. 1996) (citing *Winbush v. State by Glenwood State Hospital,* 66 F.3d 1471, 1481 (8th Cir. 1995)), or that an exception to the job application rule should apply because he "made

every reasonable attempt to convey his interest in the job to the employer," *Braziel*, 943 F. Supp. at 1100-01 (citing *Chambers v. Wynne School Dist.,* 909 F.2d 1214 (8th Cir. 1990)).  As to the first allegation, Mr. Funderburg alleges that Chief Sergeant "told me if I was terminated from the police department, I would never be able to apply and get a job with the City of Pine Bluff."  (Dkt. No. 9-1, at 69-70).  However, Mr. Funderburg agrees that Chief Sergeant is the one who provided to him a termination letter advising that he had "the option to apply for any civilian position that may be open within the city."  (*Id.*, at 69).  When asked whether Chief Sergeant had any input in hiring decisions for other departments of Pine Bluff, Mr. Funderburg conceded that he did not know (*Id.*, at 70).  Further, the facts here do not fit squarely under *Chambers*, which generally requires that a position not be posted or advertised for a formal application exception to apply.   After Mr. Funderburg claims to have submitted his letter three times to Chief Whitfield and Ms. Conaway in Human Resources, he acknowledges that he was advised of certain positions Chief Sergeant knew were coming open and advised in his termination letter that he had "the option to apply for any civilian position that may be open within the city."  (Dkt. No. 9-1 at 69).

Given the sequence of these events, Mr. Funderburg offers no persuasive explanation for why he believed that a formal application was not necessary for consideration for the open positions or why he did not submit one.  Regardless of whether Mr. Funderburg was told by Chief Whitfield or Chief Sergeant, or believed, that he had to resign from the Pine Bluff Police Department to apply for a civilian position, there is no dispute that Mr. Funderburg was told that he had the option to apply for any open civilian position yet failed to do so at any point before or after his termination from the Pine Bluff Police Department.

Moreover, many of these claims regarding what Mr. Funderburg recalls being told about having to resign before applying are made solely by Mr. Funderburg, unsupported by any other

record evidence aside from Mr. Funderburg's own affidavits. There is no question that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006) (quoting *Anderson,* 477 U.S. at 249). However, a properly supported motion for summary judgment is not defeated by self-serving affidavits. *Conolly,* 457 F.3d at 876 (citing *Davidson & Assocs. v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.")). Aside from Mr. Funderburg's affidavits, he has come forward with very little record evidence to support his claims, despite having had the opportunity for full and fair discovery in this case.

Further, even if the Court were inclined to excuse Mr. Funderburg's failure to make a formal application and to credit his reasons for that failure, there is no record evidence that with his restrictions Mr. Funderburg was qualified for the open position or any open positions with Pine Bluff. He must demonstrate that he was "qualified" for the alternative position, meaning able to satisfy the legitimate prerequisites for the alternative position and able to perform the essential functions of the alternative position with or without reasonable accommodation. *Cravens*, 214 F.3d at 1019-20. The employee must show that he could have been reasonably accommodated if not for the employer's lack of good faith. *Faidley*, 889 F.3d at 943-44.

For these reasons, the Court concludes that Mr. Funderburg fails to meet his burden to demonstrate an available reasonable accommodation. Because no reasonable accommodation was available, Pine Bluff is not liable for purportedly failing to engage in the interactive process. *Scruggs*, 817 F.3d at 1094.

To the extent Mr. Funderburg argues that Pine Bluff violated the acts under which he sues by requiring him to be completely free of any restrictions to return to work, the Court rejects this argument. An employer may not issue a blanket refusal to accommodate an employee, but this record does not support such an allegation. Pine Bluff through its employees provided to Mr. Funderburg a temporary, light duty assignment in TRU for a period of time; picked him up for work and dropped him off after work for that period of time; discussed with Mr. Funderburg his treating doctors' limitations and restrictions; explained to Mr. Funderbug the Pine Bluff Police Department's position with respect to Mr. Funderburg's ability to perform a Pine Bluff Police Department job with his limitations and restrictions; advised Mr. Funderburg to utilize his sick leave and vacation time and to request FMLA leave when appropriate; and informed Mr. Funderburg of posted and open positions in Pine Bluff to which he could apply. Although Mr. Funderburg posits through his own affidavits why, in his view, all of these efforts were insufficient, he does not contest that these efforts were made. On the basis of the undisputed record evidence, the Court rejects Mr. Funderburg's contention that he had to be completely free of any restrictions to return to work.

For these reasons, the Court grants summary judgment in favor of Pine Bluff on Mr. Funderburg's disability discrimination claim.

## V.       Retaliation Under The ADA, The Rehabilitation Act, And The ACRA

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The Eighth Circuit Court of Appeals also has held that a person who is terminated after unsuccessfully seeking an accommodation may pursue a retaliation claim under the ADA, if the person had a good faith

belief that the requested accommodation was appropriate. *Hill*, 737 F.3d at 1218 (citing *Heisler v. Metro. Council,* 339 F.3d 622, 632 (8th Cir. 2003)). The Eighth Circuit also has recognized a cause of action for retaliation under the Rehabilitation Act, although the textual basis for the claim is not well explained in cases. *Hill*, 373 F.3d at 1218 (citing *Neudecker v. Boisclair Corp.,* 351 F.3d 361, 363-64 (8th Cir. 2003); *Hoyt v. St. Mary's Rehab. Ctr.,* 711 F.2d 864, 867 (8th Cir. 1983)). Retaliation claims under the two statutes are treated interchangeably. *Hill*, 737 F.3d at 1218; *Mershon v. St. Louis Univ.,* 442 F.3d 1069, 1077 n. 3 (8th Cir. 2006); *Neudecker,* 351 F.3d at 364. The Court also evaluates ACRA retaliation claims under the same legal framework. *See Brown v. City of Jacksonville*, 711 F.3d 883, 892 (8th Cir. 2013); *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 792 (8th Cir. 2011).

To establish a *prima facie* case of retaliation, Mr. Funderburg must show that he engaged in protected activity based on a reasonable, good faith belief that an agent of the employer was engaging in disability discrimination and that he suffered an adverse employment action causally linked to that protected conduct. *Lenzen v. Workers Comp. Reinsurance Ass'n*, 705 F.3d 816, 821 (8th Cir. 2013). Such claims typically are analyzed under the *McDonnell Douglas* burden-shifting framework. *Hill*, 737 F.3d at 1719 (referring to *McDonnell Douglas,* 411 U.S. at 802-03).

Courts have recognized that requesting accommodation is a protected activity. *Hill*, 737 F. 3d at 1719; *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003); *Kirkeberg v. Canadian Pac. Ry.,* 619 F.3d 898, 908 (8th Cir. 2010). Further, around the time that he submitted his letter requesting accommodation, Mr. Funderburg also filed his EEOC charge, which also is a protected activity. Termination constitutes an adverse action. In Pine Bluff's amended motion for summary judgment, Pine Bluff asserts that Mr. Funderburg has no evidence that the exercise of his FMLA,

ADA, ACRA, or Rehabilitation Act rights was causally connected to his termination (Dkt. No. 31, at 1). Mr. Funderburg responded to this amended motion (Dkt. Nos. 35, 36).[6]

Here, the Court understands Mr. Funderburg's evidence of a causal connection for his retaliation claim is temporal proximity: He was terminated after requesting an accommodation and filing his EEOC charge. Pine Bluff contends that it terminated Mr. Funderburg because he could not perform the essential functions of a Pine Bluff Police Department officer with or without reasonable accommodation; he had exhausted his sick leave, his vacation time, and his FLMA leave; and at the end of that time, he still could not return to work as a police officer (Dkt. Nos. 8, at 7-8; 39, at 4). As a result, Pine Bluff terminated Mr. Funderburg as a Pine Bluff Police Department officer but advised him that he could apply for other jobs with Pine Bluff (Dkt. No. 9-1, at 69).

"Especially where the employer's proffered reason for action is virtually contemporaneous with the protected activity," the Eighth Circuit is "disinclined to declare a genuine issue of fact for trial based on temporal proximity alone." *Hill*, 737 F.3d at 1219 (citing *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1114 (8th Cir. 2001)). To the extent Mr. Funderburg suggests that there were open positions that he could perform at the time of his termination, the Court has rejected this contention when examining his discrimination claim. Mr. Funderburg's only other suggested evidence of unlawful motive stems from allegations regarding the temperment of Chief Whitfield in his interactions with him. This Court is reluctant to draw any inferences from these allegations, given that the Eighth Circuit has repeatedly affirmed that

---

[6] In his response to the amended motion, Mr. Funderburg repeats his assertion that "[d]efendant did not argue intent at all" with respect to the retaliation claim (Dkt. Nos. 16, at 12; 36, at 18). If Mr. Funderburg intends to argue that Pine Bluff did not move for summary judgment on his retaliation claim on the basis of causation and, therefore, he should not be required to address causation for his retaliation claim to get to the jury, the Court rejects that argument.

antidiscrimination laws do not impose a general civility code on a workplace. *See, e.g., Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998) (Title VII context); *Hasenwinkel v. Mosaic*, 809 F.3d 427, 434 (8th Cir. 2015) (FMLA context); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003) (ADA context). Moreover, these allegations are made solely by Mr. Funderburg, unsupported by any other record evidence aside from Mr. Funderburg's own affidavits.

For all of these reasons, the Court grants summary judgment in favor of Pine Bluff on Mr. Funderburg's retaliation claim.

## VI.    Claims Under The FMLA

The FMLA entitles a qualifying employee to 12 work-weeks of leave during any 12-month period if the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see also Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).

There are three types of FMLA claims. *Pulczinski*, 691 F.3d at 1005. The first type of FMLA claim, labeled an entitlement or interference claim, occurs when an employer takes action to avoid responsibilities under the FMLA such as refusing to authorize leave, discouraging an employee from taking such leave, or chilling an employee's willingness to take FMLA leave by attaching negative consequences to the exercise of those rights. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006). The second type, labeled a retaliation claim, occurs when an employer takes an adverse action against an employee for opposing any practice made unlawful under the FMLA. *Brown,* 711 F.3d at 890 (citing *Pulczinski*, 691 F.3d at 1005; *Lovland v. Emp'rs Mut. Cas. Co.,* 674 F.3d 806, 811 (8th Cir.2012)). The third type, labeled a discrimination claim, occurs when an employer takes adverse action against an employee because the employee

exercises rights to which he is entitled under the FMLA. *Id.* Mr. Funderburg alleges both an entitlement claim and a retaliation claim.

### A. FMLA Entitlement Or Interference

An entitlement, or interference, claim arises when an employee alleges he has been denied rights under the FMLA. *See Pulczinski*, 691 F.3d at 1006. "Interference includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. . . . An employer's action that deters an employee from participating in protected activities constitutes interference or restraint of the employee's exercise of his rights." *Phillips v. Mathews*, 547 F.3d 905, 911 (8th Cir. 2008) (quotations omitted). "An employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Pulczinski*, 691 F.3d at 1005; *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005). To demonstrate an entitlement claim, an "employee must show only that he or she was entitled to the benefit denied." *Stallings*, 447 at 1050 .

Pine Bluff argues that Mr. Funderburg's entitlement claim fails because, after Mr. Funderburg exhausted his paid leave time, Chief Whitfield advised Mr. Funderburg to apply for FMLA leave in a meeting and by letter. Mr. Funderburg does not address these issues in his response and argues that he can pursue the retaliation claim, even if he cannot pursue the entitlement claim.

After Mr. Funderburg exhausted his sick leave time and his vacation leave time, he had another meeting with Chief Whitfield, during which Chief Whitfield advised Mr. Funderburg that he should take FMLA leave if he could not come back to work as a police officer (Dkt. No. 37, ¶ 20). In a letter dated March 23, 2017, Chief Whitfield advised Mr. Funderburg that he had exhausted all of his paid leave time and that the Pine Bluff Police Department did not have any

job position available that was compatible with his restrictions (Dkt. No. 9-7). In the letter, Chief Whitfield recommended that Mr. Funderburg apply for FMLA leave (*Id.*). The record evidence is that Mr. Funderburg did so, was granted FMLA leave, and was out on FMLA leave for 12 weeks. There are allegations that a different Pine Bluff Police Department employee, in Mr. Funderburg's view, discouraged Mr. Funderburg from taking FMLA leave at some point during the events giving rise to his cause of action; there is no record evidence that Mr. Funderburg was denied FMLA leave to which he was entitled during his employment with the Pine Bluff Police Department. Given the undisputed record evidence, the Court finds that Mr. Funderburg has not carried his burden of showing a genuine issue of material fact regarding his entitlement claim under the FMLA. The Court grants summary judgment in favor of Pine Bluff on Mr. Funderburg's FMLA entitlement or interference claim.

### B.     FMLA Retaliation

Mr. Funderburg also brings an FMLA discrimination claim based on alleged retaliation against Pine Bluff; he claims that he was fired for taking FMLA leave. An employee alleging an FMLA discrimination claim "must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir. 2015) (citing *Pulczinski*, 691 F.3d at 1006). Without direct evidence of discrimination, a FMLA discrimination claim is "analyzed under the *McDonnell Douglas* framework." *Id.* Mr. Funderburg must show that he exercised rights afforded by the Act, that he suffered an adverse employment action, and that there was a causal connection between his exercise of rights and the adverse employment action. *Phillips v. Mathews,* 547 F.3d 905, 912 (8th Cir. 2008) (quoting *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002)). If Mr. Funderburg "establishes a prima facie case, 'the burden shifts to the [employer] to articulate a legitimate, nondiscriminatory

reason for its challenged actions.'  The employee must then demonstrate that the proffered reason is pretext, showing that 'the employer's proffered explanation is unworthy of credence' or 'persuading the court that a prohibited reason more likely motivated the employer.'" *Hudson*, 787 F.3d at 866 (alterations in original) (citations omitted).

Pine Bluff maintains that Mr. Funderburg has no evidence that his taking FMLA leave played a part in Pine Bluff's decision to terminate him.  The analysis of this retaliation claim is very similar to the Court's analysis of the ADA, Rehabilitation Act, and ACRA retaliation claim, and Pine Bluff challenges this claim in the same manner (Dkt. Nos. 8, at 7-8; 31, at 1).  Pine Bluff challenges Mr. Funderburg's ability to establish a causal connection.

Here, the Court understands Mr. Funderburg's evidence of a causal connection for his retaliation claim is temporal proximity:  He was terminated after taking FMLA leave.  Pine Bluff contends that it terminated Mr. Funderburg because he could not perform the essential functions of a Pine Bluff Police Department officer with or without reasonable accommodation; he had exhausted his sick leave, his vacation time, and his FLMA leave; and at the end of that time, he still could not return to work as a police officer (Dkt. Nos. 8, at 7-8; 39, at 4).  As a result, Pine Bluff terminated Mr. Funderburg as a Pine Bluff Police Department officer but advised him that he could apply for other jobs with Pine Bluff (Dkt. No. 9-1, at 69).

"Especially where the employer's proffered reason for action is virtually contemporaneous with the protected activity," the Eighth Circuit is "disinclined to declare a genuine issue of fact for trial based on temporal proximity alone."  *Hill*, 737 F.3d at 1219 (citing *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1114 (8th Cir. 2001)).  To the extent Mr. Funderburg suggests that there were open positions that he could perform at the time of his termination, the Court has rejected this contention when examining his discrimination claim.  Mr. Funderburg's

only other suggested evidence of unlawful motive stems from allegations regarding the temperment of Chief Whitfield in his interactions with him. This Court is reluctant to draw any inferences from these allegations, for the reasons previously explained in this Order.

Aside from Mr. Funderburg's self-serving affidavits submitted in an attempt to generate a disputed issue of material fact, Mr. Funderburg has come forward with very little record evidence to support his claims, despite having had the opportunity for full and fair discovery in this case. For these reasons, the Court grants summary judgment in favor of Pine Bluff on Mr. Funderburg's FMLA retaliation claim.

To the extent Mr. Funderburg intends to base this claim on a theory that he applied for an available position with the City of Pine Bluff but was refused, evidencing retaliation for taking FMLA leave, the Court rejects this argument. For reasons previously explained in this Order, the Court rejects Mr. Funderburg's argument that there were available positions with the Pine Bluff Police Department or the City of Pine Bluff that he could perform with his restrictions with reasonable accommodation. The undisputed record evidence is that Mr. Funderburg did not apply for any open positions with the City of Pine Bluff before or after his termination. For the reasons previously explained in this Order, the Court is not inclined to excuse Mr. Funderburg's failure to apply for a position. Even if the Court were inclined to excuse that failure, there still is no record evidence that there were available positions with the Pine Bluff Police Department or the City of Pine Bluff that Mr. Funderburg could perform with his restrictions with reasonable accommodation but was not hired to perform. For these reasons, the Court grants summary judgment in favor of Pine Bluff on Mr. Funderburg's FMLA retaliation claim.

## VII. Conclusion

For these reasons, the Court dismisses without prejudice Mr. Funderburg's illegal exaction claim and grants summary judgment in favor of Pine Bluff on Mr. Funderburg's ADA, Rehabilitation Act, and ACRA discrimination and retaliation claims and in favor of Pine Bluff on Mr. Funderburg's FMLA claims.  The Court denies Mr. Funderburg the relief he seeks; his claims are dismissed. Judgment will be entered accordingly.

It is so ordered, this the 30th day of September, 2019.

Kristine G. Baker
United States District Judge